¶ 1.
SHIRLEY S. ABRAHAMSON, J.
This is a review of a published decision of the court of appeals.[1] The court of appeals affirmed a judgment and an order of the Circuit Court for Grant County, Craig R. Day, Judge, in favor of the plaintiff, Braylon Seifert (by his guardian ad litem, Paul Scoptur, and his parents, Kimberly Seifert and David Seifert) and against the defendants, Dr. Kim Balink (the defendant doctor) and Proassurance Wisconsin Insurance Company.
¶ 2. This medical malpractice case is based on the claim that the defendant doctor was negligent in the prenatal care of Braylon Seifert's mother and in Braylon's delivery in May 2009.
¶ 3. Complications arose during Braylon's delivery. Almost immediately after Braylon's head appeared, the head retracted, indicating a shoulder dys-tocia, that is, indicating that the shoulder was stuck, prohibiting the body from being delivered. The defendant doctor undertook a series of steps to resolve the dystocia and delivered the baby. Braylon's shoulder *537 was injured, however, and the growth and function of Braylon's left arm are permanently and severely limited.
¶ 4. Braylon claims that the defendant doctor's care during delivery fell below the standard of reasonable care and caused him to have a permanent brachial plexus injury, that is, to have a permanent injury to the nerves that animate his left arm.
f 5. Braylon's obstetrical expert witness, Dr. Jeffrey Wener, testified that he was familiar with the standard of care for family practitioners practicing obstetrics with regard to prenatal care, labor, and delivery. Dr. Wener explained the reasonable care to be used in a case like the instant one and opined that the care provided and the procedures used by the defendant doctor fell below the standard of reasonable care.
¶ 6. The defendants challenged Dr. Wener's testimony in the circuit court, in the court of appeals, and in this court as inadmissible under the recently amended Wis. Stat. § 907.02(1) (2013-14).[2] This amended statute governing the admissibility of expert evidence was enacted in 2011. It adopted the federal evidentiary standard codified in Federal Rule of Evidence 702 (2000), which in turn adopted the reliability standard explicated in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).
¶ 7. The new Daubert aspect of Wis. Stat. § 907.02(1) became effective February 1, 2011, and applies in the instant case.[3] It requires that expert testimony be based on sufficient facts or data and that *538 the expert testimony be the product of reliable principles and methods.[4] The expert witness must apply the principles and methods reliably to the facts of the case.[5] These three aspects of the Daubert standard are often referred to as the "reliability standard."
¶ 8. Both the circuit court and the court of appeals concluded in the instant case that Dr. Wener's testimony was admissible under § 907.02(1).
f 9. The jury's special verdict found that the defendant doctor was negligent in the delivery of Braylon and in the prenatal care of his mother and that this negligence was a cause of injury to Braylon. The jury further found that Braylon should be awarded $100,000 for past pain, suffering, disability, and disfigurement and $1,650,000 for future pain, suffering, disability, and disfigurement.
¶ 10. The jury did not award any damages to Braylon's parents. The jury did not find that the *539 defendant doctor violated informed consent. These two rulings are not at issue in this review.
¶ 11. The circuit court entered judgment for Braylon for $135,000 in medical expenses and $750,000 in pain and suffering, "as reduced pursuant to Wisconsin Statute, plus interest thereon provided by law."[6]
¶ 12. On three occasions, the circuit court carefully and extensively considered the defendants' challenges to the admissibility of Dr. Wener's testimony under Wis. Stat. § 907.02(1): at a "Daubert" hearing before trial, on a challenge to Dr. Wener's testimony at trial, and on motions after verdict. The circuit court ruled in favor of admitting Dr. Wener's testimony at each of these junctures.
¶ 13. Seeking a new trial, the defendants raise three issues in this court:
I. Did the circuit court err in admitting the testimony of Dr. Jeffrey Wener, Braylon's medical expert? The defendants claim that because Dr. Wener's testimony was experience-based, his method was unreliable and inadmissible under Wis. Stat. § 907.02(1).
II. Did several remarks of Braylon's counsel during closing argument violate the circuit court's orders in limine, prejudice the jury, and warrant a new trial?
III. Should this court grant a new trial in the interests of justice pursuant to Wis. Stat. § 751.06?
¶ 14. The court of appeals affirmed the judgment of the circuit court, concluding that a new trial was not warranted.
*540 f 15. For the reasons set forth, we affirm the decision of the court of appeals affirming the circuit court's judgment and order that a new trial was not warranted. We conclude:
I. The circuit court did not err in applying Wis. Stat. § 907.02(1) and admitting as reliable Dr. Wener's expert medical testimony on the standard of reasonable care based on his personal experiences.
II. The circuit court did not err in concluding that Braylon's counsel's remarks during closing argument did not constitute prejudicial error justifying a new trial.
III. A new trial should not be granted pursuant to Wis. Stat. § 751.06 in the interests of justice.
¶ 16. We shall address each issue in turn. The facts and law relevant to each issue are stated in the discussion of that issue.
¶ 17. The first issue entails the defendants' challenge to the testimony of Braylon's medical expert, Dr. Jeffrey Wener, as unreliable and inadmissible under Wis. Stat. § 907.02(1). Dr. Wener testified about the standard of reasonable care in the instant case and how the defendant doctor breached the standard.
¶ 18. We review the circuit court's admission of Dr. Wener's testimony for compliance with the Daubert reliability standard codified in Wis. Stat. § 907.02(1). The defendants' challenge was that Dr. Wener's experience-based testimony is not the product of a reliable method. We conclude that Dr. Wener's testimony was reliable and admissible under § 907.02(1). *541 Our reasoning in reaching the conclusion that the circuit court did not erroneously exercise its discretion in admitting Dr. Wener's testimony proceeds as follows:
A. We set forth the facts of the defendant doctor's prenatal care of Braylon's mother and conduct during Braylon's delivery. See ¶¶ 19-28, infra.
B. We examine undisputed facets of the case, including aspects of Dr. Wener's testimony and the standard of reasonable care applicable to the defendant doctor in the instant case. See ¶¶ 29-37, infra.
C. We summarize Dr. Wener's testimony about the standard of reasonable care of a family practice doctor practicing obstetrics. Dr. Wener's testimony was based on his personal experiences; his opinion was that the defendant doctor breached that standard. See ¶¶ 38-49, infra.
D. We discuss the reliability standard set forth in Wis. Stat. § 907.02(1) that governs admission of expert evidence. We pay special attention to assessing the method used by a medical expert based on the expert's personal experiences. See ¶¶ 50-93, infra.
E. We set forth the standard for reviewing a circuit court's determination that medical expert testimony is admissible under the reliability standard incorporated in Wis. Stat. § 907.02(1). See ¶¶ 94-100, infra.
F. Against this backdrop of the teachings about the reliability of the methodology of medical expert opinion testimony based on personal experiences and the standards for reviewing a circuit court's determination of reliability and admissibility, we *542 review the circuit court's ruling and conclude, as did the court of appeals, that the circuit court did not erroneously exercise its discretion in admitting Dr. Wener's expert medical testimony on the standard of reasonable care based on his personal experiences. Accordingly, we affirm the decision of the court of appeals affirming the circuit court's admission of Dr. Wener's testimony. See ¶[¶ 101-146, infra.
A
¶ 19. The defendant doctor, a family practitioner, provided prenatal care to Braylon's mother during regular prenatal visits and also delivered Braylon.
¶ 20. During the regular prenatal visits, as relevant here, the defendant doctor measured the mother's weight, tested the mother for gestational diabetes, and performed fundal height measurements. Obstetricians use the results of these tests to estimate the baby's birth size. An obese or diabetic mother and a large fundal height indicate macrosomia (a large baby). The baby's expected weight influences decisions made leading up to and during the delivery.
f 21. Braylon's mother weighed 269 pounds at the start of her pregnancy, and she gained approximately 36 pounds during the pregnancy.
¶ 22. The defendant doctor used a one-hour glucose screening test to determine whether the mother had gestational diabetes. The test result was 131 mg/dL. A three-hour glucose screening test diagnoses gestational diabetes more accurately.
¶ 23. The defendant doctor also performed fun-dal height measurements, which, according to Dr. Wener, involves "literally putting a tape measure on *543 mom's pubic bone and then extending the tape to the top of the fundus, which is the top of the mom's uterus."
¶ 24. Obstetricians may also perform an ultrasound near the date of delivery to get a more accurate estimate of the baby's size. The defendant doctor did not perform an ultrasound.
f 25. The defendant doctor estimated that Bray-Ion would weigh eight pounds, eight ounces at birth. Braylon's actual birth weight was nine pounds, twelve ounces.
f 26. Braylon's mother arrived at the hospital on May 28, 2009 for inducement of labor. Initially, things went well. The mother was completely dilated and ready to push by 11:00 p.m. After an hour, the baby had started descending but Braylon's mother had grown tired.
¶ 27. The defendant doctor then decided to use a vacuum device to assist in the delivery. This device is essentially a suction cup that attaches to the baby's head and is used to aid the mother's efforts. Thirteen minutes and four contractions later, the baby's head delivered.
f 28. Right after the baby's head emerged, it retracted into the mother (the "turtle sign") and the defendant doctor was faced with a shoulder dystocia. A shoulder dystocia occurs when one or both of the baby's shoulders become stuck inside the mother's body and prevent delivery. The defendant doctor then performed a series of well-known obstetrical maneuvers (physical manipulations to mother and baby) to resolve the dystocia. The baby was delivered approximately three minutes after the diagnosis of shoulder dystocia.
*544 B
¶ 29. Before we delve into the substance of Dr. Wener's challenged testimony, we turn to undisputed facets of the case, including aspects of Dr. Wener's testimony and the standard of reasonable care for a family practice doctor practicing obstetrics.
f 30. The parties do not dispute that the applicable standard of care under Wisconsin law is reasonable care for a family practice doctor practicing obstetrics and that a family practice doctor may be liable for injury caused by breach of that standard of care.
¶ 31. Nor do the parties dispute that the jury in the instant case was properly instructed on this standard of reasonable care. The circuit court presented the standard of reasonable care, as set forth in Wisconsin Jury Instruction Civil 1023, to the jury as follows:
In treating and diagnosing Kimberly Seifert's pregnancy, labor, and delivery, Dr. Kay Balink was required to use the degree of care, skill, and judgment which reasonable family practice doctors practicing obstetrics would exercise in the same or similar circumstances, having due regard for the state of medical science at the time of the pregnancy, labor, and delivery. A doctor who fails to conform to this standard is negligent.
The burden is on the plaintiffs to prove that Dr. Kay Balink was negligent. A doctor is not negligent; [sic] however, for failing to use the highest degree of care, skill, and judgment, or solely because a bad result may have followed her care, and treatment and/or diagnosis.
The standard you must apply in determining if Dr. Kay Balink is negligent is whether Dr. Kay Balink *545 failed to use the degree of care, skill, and judgment which reasonable family practice doctors practicing obstetrics would exercise given the state of medical knowledge at the time of the treatment and diagnosis in issue. (Emphasis added.)
¶ 32. The parties do not dispute that Braylon was required to introduce expert testimony to describe the care that satisfies the standard of reasonable care in the instant case and to detail the defendant doctor's failure to furnish care that met this standard.
f 33. Braylon offered Dr. Wener's testimony to establish the standard of reasonable care for a family practice doctor practicing obstetrics. The parties do not dispute that Dr. Wener is a qualified expert; that Dr. Wener has "scientific, technical, or other specialized knowledge" that could assist the trier of fact; and that if admissible, his testimony would be relevant and helpful to the trier of fact. Wis. Stat. § 907.02(1).
¶ 34. The parties also do not dispute:
• Braylon suffered a shoulder dystocia.
• Immediately after the delivery, Braylon's left upper arm was not functioning, and within a few days after birth he was diagnosed with a permanent brachial plexus injury.
• Braylon's brachial plexus injury limits the growth and function of the arm, required surgery, and will require continued therapy to ameliorate the injury.
• An obese mother, gestational diabetes, and a mac-rosomic baby increase the risk of shoulder dystocia.
¶ 35. The circuit court stated that the parties do not seriously question that the application of excessive traction beyond what the fetus can withstand may be a *546 cause of severe brachial plexus injuries during childbirth, although the circuit court acknowledged that there were contentions that other causes may have been present in the instant case. Relatedly, the parties do not dispute that the use of a vacuum during delivery may increase the risk of a brachial plexus injury.
¶ 36. Collectively, these shoulder dystocia risk factors—obese mother, gestational diabetes, macroso-mic baby, excessive traction, and vacuum-assisted delivery—are undisputed; these are the principles that guide Dr. Wener's testimony.
¶ 37. The defendants' challenge to Dr. Wener's testimony is that his testimony is not the product of reliable methods, that is, the defendants contend that Dr. Wener's methodology is unreliable. Specifically, the defendants argue that Dr. Wener's testimony is not the product of reliable methods under Wis. Stat. § 907.02(1) because the testimony was based on Dr. Wener's personal experiences. In evaluating the defendants' challenge, we begin by reviewing the substance of Dr. Wener's testimony.
C
f 38. Dr. Wener testified at length about the standard of reasonable care in the instant case and opined that the defendant doctor breached that standard of reasonable care. Dr. Wener's lengthy expert medical testimony was based on his personal experiences, and he was subjected to extensive cross-examination.
¶ 39. Dr. Wener described his extensive qualifications. He stated that he is a board certified obstetrician-gynecologist (OB-GYN) who practices in a suburb outside of Chicago. An OB-GYN provides medical care to women. The obstetric portion of the practice *547 relates to pregnancy; the gynecological portion of the practice relates to female patients who are not pregnant.
¶ 40. As to his obstetrics practice, Dr. Wener estimated that he has delivered between 7,500 and 8,000 babies and has encountered between 37 and 40 instances of shoulder dystocia in his 36-year career.
¶ 41. In addition to private practice, Dr. Wener has taught medical students and residents and was chairman of the obstetrics-gynecology department at a hospital for about 20 years. As chairman, he was responsible for the quality of care provided by physicians practicing in his department, and he sat on the medical executive committee of the hospital. He further testified that he examines medical records for both plaintiff and defense attorneys. Dr. Wener is a member of the American College of Obstetricians and Gynecologists.
¶ 42. Dr. Wener did not preface each of his statements with the words "a reasonable family doctor practicing obstetrics." The clear inference from Dr. Wener's testimony, taken as a whole, is that he was setting forth and applying a standard of reasonable care for prenatal care and delivery applicable to a family practitioner practicing obstetrics. Furthermore, the jury instructions declared that the burden was on Braylon to prove that the defendant doctor was negligent and that the defendant doctor had to conform to the standard of care "which reasonable family practice doctors practicing obstetrics would exercise in the same or similar circumstances." See ¶ 31, supra.
¶ 43. Dr. Wener's experience and testimony demonstrate that he is familiar with the standard of reasonable care for family practice doctors practicing obstetrics.
*548 ¶ 44. Dr. Wener concluded that the defendant doctor in the instant case breached the standard of reasonable care in several respects. He testified that several risk factors should have alerted the defendant doctor to the risk of shoulder dystocia, such as the pre-pregnancy weight of the mother and the weight she gained during pregnancy, the risk of gestational diabetes, and the risk of a large baby.
¶ 45. In Dr. Wener's opinion, these three interrelated risk factors were important because, added together, they increased the risk of shoulder dystocia. Dr. Wener explained, "A doctor has to take care of every patient individually. And in doing so there are risk factors that every patient has. And you have to look at the patient as a whole and look at all of the risk factors as they are applicable to the patient." Dr. Wener opined to a reasonable degree of medical certainty that, based on his education, training, experience, and the facts of the instant case, it was more likely than not that the mother was a gestational diabetic because of her weight and a one-hour glucose test result of 131 mg/dL.
¶ 46. Dr. Wener asserted that the defendant doctor fell below the standard of reasonable care for a family practice doctor practicing obstetrics by failing to order a three-hour glucose test for Braylon's mother. Dr. Wener concluded that the standard of reasonable care required a three-hour test when the result from the one-hour test was over 130 mg/dL and the mother was obese. The three-hour glucose test would have been more likely to diagnose gestational diabetes, a condition associated with increased risk of shoulder dystocia.
¶ 47. Dr. Wener also gave his opinion to a reasonable degree of medical certainty that, in view of the *549 mother's size and the one-hour test result, the defendant doctor breached the standard of reasonable care for a family practice doctor practicing obstetrics by failing to perform an ultrasound on Braylon's mother immediately prior to delivery. An ultrasound, in Dr. Wener's opinion, would have given the defendant doctor a better estimate of Braylon's fetal weight and whether Braylon was macrosomic (that is, a large baby), a condition that Dr. Wener associated with a greater risk of shoulder dystocia.
¶ 48. In addition, Dr. Wener testified that the defendant doctor's use of vacuum assistance during the birthing process breached the standard of reasonable care by increasing the risk of shoulder dystocia. Explaining that it is risky to use the vacuum on a patient exhibiting the risk factors that Braylon's mother exhibited, Dr. Wener opined—to a reasonable degree of medical certainty—that a vacuum should not have been applied at all in the instant case.
¶ 49. Dr. Wener also testified to a reasonable degree of medical certainty that the defendant doctor breached the standard of reasonable care for a family practice doctor practicing obstetrics by applying excessive traction beyond what the fetus could withstand in attempting to resolve the shoulder dystocia and that this excessive traction (not the mother's pushing) had a causative effect on Braylon's brachial plexus injury.
D
¶ 50. With the substance of Dr. Wener's testimony in mind, we turn to the reliability standard governing the admission of expert evidence set forth in the 2011 amendment to Wis. Stat. § 907.02(1). The *550 following emphasized language in Wis. Stat. § 907.02(1) adopting the reliability standard was added in 2011.
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if the testimony is based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case.
¶ 51. The 2011 amendment to Wis. Stat. § 907.02(1) changed the law to mirror Federal Rule of Evidence 702, which codifies Daubert v. Merrell Dow Pharmaceuticals Inc., 509 U.S. 579 (1993), and its progeny.[7]
¶ 52. Before 2011, when the legislature adopted the Daubert reliability standard in amended Wis. Stat. § 907.02(1), Wisconsin case law applied the "relevancy test" to the admission of expert evidence: Expert evidence was admissible if the witness was qualified, the evidence assisted the trier of fact, and the evidence was relevant.[8]
*551 ¶ 53. Wisconsin case law had rejected both Frye's "general acceptance test"[9] and the federal Daubert reliability standard.[10]
¶ 54. Professor Daniel Blinka concludes that Daubert "created a reliability standard that is less a bright-line test, as it is often assumed to be, and more an evidentiary porridge."[11]
¶ 55. The instant case is this court's first occasion to apply amended Wis. Stat. § 907.02(1). We do not write on a blank slate. Wisconsin Stat. § 907.02(1) mirrors Federal Rule of Evidence 702 as amended in *552 2000,[12] and we may look for guidance and assistance in interpreting and applying § 907.02(1) to the Daubert case and its progeny, to the Advisory Committee Notes to Federal Rule of Evidence 702,[13] and to federal and *553 state cases interpreting the text of Rule 702 or an analogous state law. The federal or state interpretations, however, are not necessarily dispositive.[14]
¶ 56. As we have previously noted, the federal reliability standard for the admissibility of expert evidence is explained in Daubert. After Daubert, the United States Supreme Court decided General Electric Co. v. Joiner, 522 U.S. 136 (1997), and Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999). This trilogy of cases delineated the contours of the reliability standard.
f 57. In Daubert—a products liability case—the Court rejected Frye's general acceptance test and concluded that Federal Rule of Evidence 702 contemplates that trial courts have a gatekeeping obligation. This gatekeeping obligation "assign[s] to the trial court the task of ensuring that a scientific expert is qualified" and that his or her "testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597.
¶ 58. In the instant case, the parties challenge the reliability of Dr. Wener's expert medical testi *554 mony.[15] We therefore focus our discussion on the reliability prong of Wis. Stat. § 907.02(1), specifically the reliability of the methods used by Dr. Wener.[16] The trial court must be satisfied that the testimony is reliable by a preponderance of the evidence. Daubert, 509 U.S. at 593; Wis. Stat. § 901.04.
¶ 59. Daubert makes the trial court a gatekeeper, not a fact finder. When credible, qualified experts disagree, a litigant is entitled to have the jury, not the trial court, decide which expert to believe. Dorn v. Burlington N. Santa Fe R.R. Co., 397 F.3d 1183, 1196 (9th Cir. 2005).[17]
*555 ¶ 60. Although the Daubert Court focused its discussion on scientific testimony, the Supreme Court later clarified that Daubert's inquiry applies not just to scientific evidence, but to all expert opinions, "whether the testimony reflects scientific, technical, or other specialized knowledge." Kumho Tire, 526 U.S. at 149.
¶ 61. The reliability standard "entails a preliminary assessment of whether the reasoning or methodology is scientifically valid." Daubert, 509 U.S. at 592-93. Reliability depends "solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 595.
¶ 62. To guide the reliability analysis, the Daubert court provided a nonexhaustive[18] list of factors that make scientific evidence sufficiently reliable for admission: "(1) whether the methodology can and has been tested; (2) whether the technique has been subjected to peer review and publication; (3) the known or potential rate of error of the methodology; and (4) whether the technique has been generally accepted in the scientific community." Heller v. Shaw Indus., Inc., 167 F.3d 146, 152 (3d Cir. 1999), citing Daubert, 509 U.S. at 592-93.
*556 ¶ 63. The Federal Rules Advisory Committee added five factors to those stated in Daubert to guide decisions about reliability:
(1) Whether experts are "proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying. Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1317 (9th Cir. 1995).
(2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion. See General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997) (noting that in some cases a trial court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered").
(3) Whether the expert has adequately accounted for obvious alternative explanations. See Claar v. Burlington N.R.R., 29 F.3d 499 (9th Cir. 1994) (testimony excluded where the expert failed to consider other obvious causes for the plaintiffs condition). Compare Ambrosini v. Labarraque, 101 F.3d 129 (D.C. Cir. 1996) (the possibility of some uneliminated causes presents a question of weight, so long as the most obvious causes have been considered and reasonably ruled out by the expert).
(4) Whether the expert "is being as careful as he would be in his regular professional work outside his paid litigation consulting." Sheehan v. Daily Racing Form, Inc., 104 F.3d 940, 942 (7th Cir. 1997). See Kumho Tire Co. v. Carmichael, 119 S. Ct. 1167, 1176 (1999) (Daubert requires the trial court to assure itself that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").
(5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of *557 opinion the expert would give. See Kumho Tire Co. v. Carmichael, 119 S. Ct. 1167, 1175 (1999) (Daubert's, general acceptance factor does not "help show that an expert's testimony is reliable where the discipline itself lacks reliability, as for example, do theories grounded in any so-called generally accepted principles of astrology or necromancy."); Moore v. Ashland Chemical, Inc., 151 F.3d 269 (5th Cir. 1998) (en banc) (clinical doctor was properly precluded from testifying to the toxicological cause of the plaintiffs respiratory problem, where the opinion was not sufficiently grounded in scientific methodology); Sterling v. Velsicol Chem. Corp., 855 F.2d 1188 (6th Cir. 1988) (rejecting testimony based on "clinical ecology" as unfounded and unreliable)."[19]
¶ 64. Considering the broad range of cases in which expert evidence arises, courts have not been constrained by the listed factors. How courts apply these factors necessarily varies case by case, expert by expert. "Too much depends upon the particular circumstances of the particular case at issue" to impose hard and fast rules. Kumho Tire, 526 U.S. at 150. A trial court conducts its reliability analysis with wide latitude.[20] Kumho Tire emphasized that the application of *558 the Daubert factors is a flexible inquiry: "[T]he law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." Kumho Tire, 526 U.S. at 142.
¶ 65. Thus, the trial court may consider some, all, or none of the factors listed to determine whether the expert evidence is reliable. Federal Rule of Evidence 702 Advisory Committee's Note (2000).
¶ 66. Because the instant case involves expert medical testimony based on a witness's personal experiences, we discuss the reliability of expert medical opinion based on the expert's personal experiences.
¶ 67. Daubert affirms that experience-based expert evidence may pass muster as a method under the reliability requirement. Though the Daubert Court stated that "[p]roposed testimony must be supported by appropriate validation—i.e., 'good grounds,' based on what is known," the Court also stated that the very structure of the rules of evidence suggest that experience can be "good grounds." Daubert, 509 U.S. at 590.
¶ 68. Daubert's reference to the structure of the rules of evidence was a reference to the evidentiary rule that all witnesses except experts generally must have firsthand knowledge of the events to which they testify.[21] The Daubert court inferred that this "relaxation of the usual requirement of firsthand knowledge ... is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of this discipline." Daubert, 509 U.S. at 592.
*559 ¶ 69. Likewise, the Kumho Tire Court explicitly recognized that in some cases, "the relevant reliability concerns will focus upon personal knowledge or experience." Kumho Tire, 526 U.S. at 150.
¶ 70. In Kumho Tire, the United States Supreme Court specifically addressed the application of the Daubert reliability analysis to experience-based, nonscientific expert testimony. The Court required a witness relying on experience to offer some articulated rationale supporting his or her opinion. This Kumho Tire requirement is not "impossibly demanding."[22]
¶ 71. The Kumho Tire Court recognized that "there are many different kinds of experts, and many different kinds of expertise," Kumho Tire, 526 U.S. at 150, so the factors set forth in Daubert and Kumho Tire "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." Kumho Tire, 526 U.S. at 150.
¶ 72. The Kumho Tire Court emphasized that in the case of a non-scientific expert, "the relevant reliability concerns may focus upon personal knowledge or experience." Kumho Tire, 536 U.S. at 150. The point, according to Kumho Tire, is to ensure that an expert, "whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire, 526 U.S. at 152.[23]
*560 ¶ 73. The Federal Advisory Committee Note to the 2000 Amendment to Rule 702 also recognizes that expert evidence based on personal experiences can meet the reliability test and offers the following general guidance for evaluating experience-based testimony:
If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.[24]
¶ 74. The trial court's gatekeeping function in regard to experience-based testimony, however, "requires more than simply 'taking the expert's word for it.' "[25]
¶ 75. An expert cannot establish that a fact is generally accepted merely by saying so.[26] Trial courts do not have "to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." Such an application is unreliable because "there is simply too great an analytical gap between *561 the data and the opinion offered." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).
¶ 76. Thus, for example, a federal district court excluded proffered expert testimony because the witness's experience was not extensive enough to indicate reliability for testimony based on personal experience. The expert's "sample size" (himself alone) was too small:
Essentially, his proposed testimony boils down to the conclusion that because he has been able to perform police work successfully despite his monocular vision, then the Plaintiff will likewise be successful. This is a leap of faith that the Court is unwilling to make, as there is nothing inherent about [the witness's] own personal experience as a monocular visioned person which logically or scientifically leads to a supportable conclusion that other persons with monocular vision necessarily, or even probably, would have the same abilities that he has.
Trevino v. City of Rock Island Police Dep't, 91 F. Supp. 2d 1204, 1207 (C.D. Ill. 2000).[27]
¶ 77. Case law demonstrates, nonetheless, that courts frequently admit experience-based testimony, especially when expert medical evidence is offered. Expert medical opinion based on experience alone, "or *562 experience in conjunction with other knowledge, skill, training or education" may constitute a reliable basis.[28] "In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."[29]
¶ 78. Medicine is an example of such a field because medicine "is based on specialized as distinguished from scientific knowledge."[30] When evaluating specialized or technical expert opinion testimony, "the relevant reliability concerns may focus upon personal knowledge or experience." Kumho Tire, 526 U.S. at 150.
¶ 79. The classic medical school texts explain that medicine is scientific but not entirely a science.[31] "Medicine is not a science but a learned profession, deeply rooted in a number of sciences and charged with the obligation to apply them for man's benefit."[32] Much of medical decision-making relies on judgment and is difficult to quantify or even to assess qualitatively. In medicine, "knowledge is often uncertain," "[t]he human body is complex," and "etiology is often uncertain."[33] Furthermore, practical and ethical concerns prevent "studies calculated to establish statistical *563 proof."[34] Physicians must use their knowledge and experience as a basis for weighing known factors along with "inevitable uncertainties" to "mak[e] a sound judgment."[35]
¶ 80. That Daubert lends its analysis more favorably to more objective sciences does not bar the testimony of physicians applying their experience and clinical methods.[36] That the knowledge is uncertain "does not preclude the introduction of medical expert opinion testimony when medical knowledge permits the assertion of a reasonable opinion."[37]
¶ 81. "A trial court should admit medical expert testimony if physicians would accept it as useful and reliable."[38] In other words, expert medical opinion testimony is reliable if the knowledge underlying it *564 "has a reliable basis in the knowledge and experience of the [relevant] discipline."[39]
¶ 82. In Schneider ex rel. Estate of Schneider v. Fried, 320 F.3d 396, 406 (3d Cir. 2003), the federal Third Circuit Court of Appeals explained that a physician's "experience render [ed] his testimony reliable [and] demonstrate [d] that his testimony [was] based on 'good grounds.' " In light of his considerable professional experience, the physician's testimony on the standard of care was reliable, even if the content of the literature cited was irrelevant. The federal court of appeals concluded that the magistrate judge abused his discretion by excluding the expert testimony.[40]
*565 ¶ 83. The Schneider court stated that expert testimony does not have to be subject to peer review to be admitted under Rule 702; the physician's experience renders his or her testimony reliable and demonstrates that the testimony is based on good grounds.[41] The court recognized, however, that the degree to which the medical expert is qualified implicates the reliability of the testimony. Schneider, 320 F.3d at 406.
¶ 84. Similarly, the federal Sixth Circuit Court of Appeals held that a district court abused its discretion by excluding a physician's testimony based on extensive, relevant experience when the physician had not cited medical literature supporting his view. Dickenson v. Cardiac & Thoracic Surgery of E. Tenn., 388 F.3d, 976, 980 (6th Cir. 2004). Requiring an expert to demonstrate a familiarity with accepted medical literature or published standards in order for the testimony to be reliable in the sense contemplated by Federal Rule of Evidence 702 is an erroneous statement of the law. Dickenson, 388 F.3d at 980-81 (citing Federal Rule of Evidence 702, Advisory Committee Note expressly contemplating that an expert may testify on the basis of experience).[42]
*566 ¶ 85. The case law teaches that Daubert's role of ensuring that the courtroom door remains closed to junk science is not served by excluding medical expert testimony that is supported by extensive relevant medical experience.[43] Such exclusion is rarely justified in cases involving medical experts. Dickenson, 388 F.3d at 981. See also Daniel W. Shuman, Expertise in Law, Medicine, and Health Care, 27 J. Health Pol., Pol'y & L. 267 (2001) (characterizing the effect oí Daubert and Kumho cases on claims of medical expertise as "much ado about little").[44]
*567 ¶ 86. Instead of exclusion, the appropriate means of attacking "shaky but admissible" experience-based medical expert testimony is by "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof. ..." Daubert, 509 U.S. at 597.
Once evaluated and deemed sufficiently reliable for admission, that expert opinion [based on personal experience] is submitted to the "capabilities of the jury and of the adversary system generally."
Lapsley v. Xtek, Inc., 689 F.3d 802, 810 (7th Cir. 2012) (citing Daubert, 509 U.S. at 596).[45]
*568 E
f 87. Our next task is to determine the standard for reviewing the circuit court's gatekeeping determination under Wis. Stat. § 907.02(1). We refer to federal law to guide our analysis of the standard for review.
¶ 88. We examine the circuit court's rulings both independently as a question of law and also under the erroneous exercise of discretion standard.
¶ 89. The interpretation and application of a statute presents a question of law that this court decides independently of the circuit court and court of appeals but benefiting from their analyses. State v. Steffes, 2013 WI 53, ¶ 15, 347 Wis. 2d 683, 832 N.W.2d 101. It follows that this court decides whether the circuit court applied the proper legal standard under Wis. Stat. § 907.02(1) in the first instance independently of the circuit court and the court of appeals but benefiting from their analyses. Lees v. Carthage College, 714 F.3d 516, 520 (7th Cir. 2013) ("[w]hether the district court applied the appropriate legal framework for evaluating expert testimony is reviewed de novo"); Lewis v. CITGO Petroleum Corp., 561 F.3d 698, 705 (2009) ("we review de novo whether the court employed the correct legal standard in reaching its admissibility decision").
¶ 90. Once satisfied that the circuit court applied the appropriate legal framework, an appellate court reviews whether the circuit court properly exercised its *569 discretion in determining which factors should be considered in assessing reliability,[46] and in applying the reliability standard to determine whether to admit or exclude evidence under Wis. Stat. § 907.02(1). Gen. Elec. Co. v. Joiner, 522 U.S. 136, 141 (1997).[47]
¶ 91. Once the circuit court selects the factors to be considered in assessing reliability, the circuit court measures the expert evidence against these factors. The circuit court also determines whether the witness faithfully and properly applied the reliability principles and methodology to the facts of the case.[48]
¶ 92. In other words, a circuit court has discretion in determining the reliability of the expert's principles, methods, and the application of the principles and methods to the facts of the case.[49]
*570 ¶ 93. A trial court's decision on admissibility or exclusion of expert evidence is an erroneous exercise of discretion when a decision rests upon a clearly erroneous finding of fact, an erroneous conclusion of law, or an improper application of law to fact.[50]
F
¶ 94. Against this backdrop of the teachings about the reliability of expert medical testimony based on personal experiences and the standards for appel *571 late review of a circuit court's determination of reliability, we decide whether the circuit court erred in admitting Dr. Wener's testimony. We conclude, as did the court of appeals, that the circuit court did not erroneously exercise its discretion in admitting Dr. Wener's testimony as reliable under Wis. Stat. § 907.02(1).
¶ 95. In the first instance, we note, as a matter of law, that the circuit court applied the proper reliability standard under Wis. Stat. § 907.02(1).
¶ 96. Because the circuit court applied the correct Daubert reliability standard, our review of the circuit court's decision to admit Dr. Wener's testimony is limited to reviewing whether the circuit court erroneously exercised its discretion. See Cipollone v. Yale Indus. Prods., Inc., 202 F.3d 376, 380 (1st Cir. 2000).
¶ 97. The circuit court made a good, clear record. Based on the circuit court's extensive oral rulings on the admissibility of Dr. Wener's testimony as reliable, it is apparent that the circuit court examined federal and state case law applying the Daubert standard to medical expert testimony and fairly considered the defendants' challenges to the admissibility of Dr. Wen-er's testimony.
¶ 98. Because the circuit court was careful in exploring the applicable law and in setting out its reasoning, we can more easily review the circuit court's rulings to determine whether the circuit court erroneously exercised its discretion. We commend the circuit court's efforts and conclude that the circuit court's rulings establishing that Dr. Wener's personal clinical experiences satisfy the reliability requirement, are well reasoned, and are not an erroneous exercise of discretion.
¶ 99. The defendants make the following three principal arguments supporting their position that Dr. *572 Wener's testimony was unreliable under Wis. Stat. § 907.02(1) and was not applied reliably:
(1) Dr. Wener's testimony was unreliable under Wis. Stat. § 907.02(1) because Dr. Wener did not apply a sound methodology: Dr. Wener's testimony rested on his qualifications and "personal preferences."
(2) Dr. Wener's testimony was unreliable under Wis. Stat. § 907.02(1) because Dr. Wener did not rely on medical literature or other recognized sources of reliability.
(3) Dr. Wener's application of his opinions to the facts of the case was flawed because Dr. Wener's testimony was internally inconsistent.
¶ 100. We address each of the defendants' arguments in turn.
(1)
¶ 101. To use defendants' counsel's words, the defendants' challenge to Dr. Wener's testimony is based on "method, method, method."
¶ 102. The circuit court ruled that Dr. Wener's testimony satisfied the Wis. Stat. § 907.02(1) reliability standard because his methodology was reliable: Dr. Wener's methodology is a "classic medical methodology," looking at recognized medical indicators.
f 103. The circuit court explained that Dr. Wen-er's testimony, taken as a whole, demonstrated that Dr. Wener formulated an opinion about the standard of reasonable care of family practice doctors practicing obstetrics on the basis of his experiences, as opposed to *573 simply his own personal preference. Thus, Dr. Wener had a reliable basis for rendering an opinion.
¶ 104. In contrast, the defendants contend that Dr. Wener was really just opining based on his "personal preferences." The defendants assert that an expert cannot establish that a fact is generally accepted merely by saying so. They argue that Dr. Wener's testimony had to be based on the methods and procedures of science rather than on his subjective belief or unsupported speculation. According to the defendants, Dr. Wener's opinion about the standard of reasonable care was connected to existing data only by his own ipse dixit.
¶ 105. The circuit court regarded Dr. Wener's methods as the ordinary methodology of medicine: conscientious use of the thousands of instances in which he had delivered babies and made decisions about the care of individual patients and his teaching and hospital experiences relating to obstetrics. Echoing case law, the circuit court declared that medicine is "not a science, but a learned profession deeply rooted in a number of sciences."
¶ 106. The circuit court viewed Dr. Wener's methodology as essentially a comparison of the instant case to other deliveries, reasoning that the Daubert factors were not helpful in evaluating this methodology because a medical expert's personal clinical experience is not subject to precise measurements. "[B]e-cause the standard of care is determined by the care customarily provided by other physicians, it need not be scientifically tested or proven effective . . .." Palandjian v. Foster, 842 N.E.2d 916, 921 (Mass. 2006).
¶ 107. Dr. Wener gave ample testimony about what a family practice doctor practicing obstetrics *574 should have known and how a family practice doctor practicing obstetrics should have acted in the instant case. Dr. Wener's testimony about the standard of reasonable care of family practice doctors practicing obstetrics was based on his knowledge of family practice doctors practicing obstetrics gained through education, his decades of delivering thousands of babies, his repeated observations in decades of clinical experiences, and his numerous teaching and supervisory experiences in important positions in the field of obstetrics and gynecology. He used his many experiences to arrive at an opinion in the instant case that is sufficiently similar to his vast array of clinical experiences over decades of practice.
1 108. Dr. Wener demonstrated to the circuit court that he had formed an opinion about the standard of reasonable care of a family practice doctor practicing obstetrics and that the opinion had a reliable basis.
¶ 109. The circuit court concluded on the basis of the record and case law that it had adequate grounds to view Dr. Wener's testimony as not subjective belief, unsupported conjecture, or ipse dixit. The circuit court ruled that Dr. Wener's methodology was reliable based on Dr. Wener's extensive personal experiences. In other words, Dr. Wener's testimony was based on "good grounds." Daubert, 509 U.S. at 590.
f 110. Characterizing its pretrial decision as "a close call," and looking at the vagaries of medical treatment and diagnosis, the circuit court concluded that Dr. Wener's testimony was "reliably based on a reliable medical methodology looking at recognized factors of the standard of care."
¶ 111. The circuit court declared that Dr. Wener looked at recognized risk factors and, using his own *575 varied experiences, concluded that the defendant doctor breached the standard of reasonable care by failing to weigh these risk factors. According to the circuit court, Dr. Wener used his knowledge and experience as a basis for weighing known factors along with the inevitable uncertainties to make a sound judgment. Dr. Wener's testimony was not based on his personal preference, ruled the circuit court; it was based on clinical experience, a reliable methodology.
¶ 112. The circuit court determined that the way in which Dr. Wener "adds [the factors up] is debatable, but that's not the same as saying the way that Dr. Wener adds them up is not reliable." According to the circuit court, Dr. Wener explained the bases for his opinions in sufficient detail to permit the jury to evaluate his conclusions.
¶ 113. The circuit court obviously relied on Daubert case law in making its determination of reliability and used the language and reasoning set forth in the case law to rule on the reliability and admissibility of Dr. Wener's expert medical testimony based on personal experiences.
¶ 114. The circuit court regarded the defendants' contention that Dr. Wener's opinions are unreliable because they are untestable as failing from the outset. According to Daubert, testability is not a prerequisite to admission. Testability, like all of the Daubert factors, is a suggested way to assess methodology, not a required way to assess methodology.
¶ 115. The circuit court ruled that Dr. Wener's testimony was testable and met the Wis. Stat. § 907.02(1) standard. The circuit court reasoned that *576 "the testable principles! ] are the biological and physiological and anatomical principles that inform the conclusions that arise."
f 116. The circuit court also explained that the defendants could (and did) test Dr. Wener's testimony through cross examination, further explaining that although "medicine is a science, it is not a quantified science. It is not a measurement, in many respects. It is not engineering."
f 117. The circuit court further compared Dr. Wener's testimony with the testimony of defense experts, including Dr. Michelle Grimm, a defense expert on medical engineering, and Dr. Dwight Jonathan Rouse, an obstetrician with additional training in maternal fetal medicine.
¶ 118. According to the circuit court, some defense expert testimony actually supported Dr. Wener's testimony. For example, both Dr. Wener and the defense expert witnesses testified that applying excessive traction beyond what the fetus can withstand during childbirth violates the standard of reasonable care.
¶ 119. Accordingly, the circuit court declared that the context of the entire case supported admitting Dr. Wener's testimony as reliable:
[A]fter the trial there is a lot more context within which to analyze the issues in respect to Dr. Wener's testimony.
[[Image here]]
And I still believe that Dr. Wener's testimony met the Daubert standards as that applies to medical testimony.
[[Image here]]
*577 And after trial, Dr. Werner's position looked every bit as good, and better, than it did pretrial when the context of the other experts, Grimm and Rouse, particularly, was taken into account. And so I stand on my prior rulings as to Dr. Wener as supplemented here today with what we know after trial. His testimony was properly admitted, to the extent it was admitted.
¶ 120. In sum, the circuit court ruled that Dr. Wener's principles and methods were sufficiently reliable to be admitted, emphasizing that Dr. Wener's testimony, although shaky, is not junk science and that Dr. Wener is not a junk scientist:
Dr. Wener's opinions are shaky due to their generality, but I conclude that they are sufficiently reliable to be admitted. The methodology employed is what I will call, I guess, holistic. The defense motion parses out the various factors and how they don't match a body of opinion about that particular factor. . . . [T]he essence of Dr. Wener's opinion [is that] these elements converge and then the sum is greater than the total of the parts, essentially. It's not something that's been peer reviewed or published because it's an individualized determination based upon the facts of this case, and in using known factors.
¶ 121. We conclude, as did the court of appeals, that the circuit court did not erroneously exercise its discretion when it concluded that the Daubert factors were not helpful and that Dr. Wener's clinical methodology rendered his expert medical testimony on the standard of reasonable care based on his personal experiences reliable under Wis. Stat. § 907.02(1).
f 122. Dr. Wener's opinion based on his personal experiences satisfied the reliability standard. He identified established risk factors (principles). He then used classic, ordinary medical methods to establish the *578 standard of care of a family practice doctor practicing obstetrics and to opine that the defendant doctor breached this standard.
¶ 123. In the instant case, the reliability standard entails the circuit court's assessment of methodology. In expert medical evidence, the methodology often relies on judgment based on the witness's knowledge and experience. Accordingly, reliability concerns may focus on the personal knowledge and experience of the medical expert witness. Dr. Wener's testimony was based on his knowledge of and experience with obstetrics and family practice doctors practicing obstetrics. He gained his knowledge through education, his decades of delivering thousands of babies, his repeated observations during decades of clinical experiences, and his numerous teaching and supervisory experiences in the fields of obstetrics and gynecology. Because Dr. Wener applied an accepted medical method relied upon by physicians and had extensive personal experiences and knowledge pertaining to the standard of reasonable care, the circuit court did not erroneously exercise its discretion in admitting his testimony.
(2)
f 124. The defendants argue that Dr. Wener's testimony was mere speculation because it was not supported by even one peer reviewed publication or medical text. The defendants correctly contend, as we stated previously, that an expert cannot establish that a fact is generally accepted merely by saying so.
f 125. With respect to the defendants' arguments that Dr. Wener's testimony was not reliable because he did not rely on medical literature, the *579 circuit court concluded that Dr. Wener's approach is "not something that's been peer reviewed or published because it's an individualized determination based upon the facts of this case, and in using known factors" such as estimated maternal weight, fetal weight, and glucose levels.
¶ 126. Indeed, on cross-examination Dr. Wener said he was aware of the medical literature but that there was a wide range of statistics in the literature so that the publications were not helpful and did not directly contradict his testimony.
¶ 127. For example, Dr. Wener concluded that, considering all of the risk factors in totality, the defendant doctor breached the standard of reasonable care by failing to order a three-hour glucose test after the one-hour test's result exceeded 130 mg/dL. The defendants, citing American College of Obstetricians and Gynecologists, Clinical Management Guidelines for Obstetrician-Gynecologists No. 30 (Sept. 2001) (reaffirmed 2008) [hereinafter Guidelines], argued that Dr. Wener's opinion was erroneous because the Guidelines suggest that the reasonable standard of care requires a three-hour test when the mother's one-hour test result exceeds 140 mg/dL. The publication notes, however, that either the 130 or 140 mg/dL "threshold is acceptable." Guidelines at 762. Furthermore, the publication expressly states that it does not prescribe a standard of care: "These guidelines should not be construed as dictating an exclusive course of treatment or procedure. Variations in practice may be warranted based on the needs of the individual patient, resources, and limitations unique to the institution or type of practice." Guidelines at 759. Dr. Wener's testimony did not directly contradict the guidelines.
*580 ¶ 128. The circuit court did not bar Dr. Wener's testimony on the ground that Dr. Wener did not cite to any publications as support, reasoning that peer-reviewed literature would not be all that useful in the experience-specific methodology that Dr. Wener applied in the instant case.
¶ 129. The circuit court's conclusion was not an erroneous exercise of discretion. Dr. Wener's failure to rely on literature is no bar to admissibility. Daubert supports the circuit court in the instant case: "Publication (which is but one element of peer review) is not a sine qua non of admissibility; it does not necessarily correlate with reliability." Daubert, 509 U.S. at 593.
(3)
f 130. Reliable application, or "fit," is the final step in the Daubert analysis. The defendants argue that Dr. Wener failed to reliably apply his methodology to the facts.
f 131. The defendants argue that Dr. Wener's "holistic" methodology was unreliable. We have already discussed Dr. Wener's methodology (as part of our analysis of the defendants' objections to Dr. Wen-er's testimony) and concluded that the circuit court did not err in declaring that Dr. Wener's use of a constellation of factors is reliable, as doctors usually apply this method when treating patients.
¶ 132. The defendants also contend that Dr. Wener improperly applied his method to the instant case because his testimony was riddled with inconsistencies. The circuit court correctly concluded that inconsistencies do not necessarily render expert testimony unreliable; they go to the weight of the testi *581 mony: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596.
¶ 133. The defendants argue in this court that Dr. Wener's experience-based testimony was not reliably applied, specifically objecting to three of Dr. Wener's opinions related to prenatal care and the delivery of Braylon. The defendants objected to Dr. Wener's statements that the defendant doctor breached the standard of care by failing to order a three-hour glucose test; that the defendant doctor breached the standard of care by failing to perform an ultrasound immediately prior to delivery; and that the defendant doctor breached the standard of care by doing a vacuum-assisted delivery. The defendants again argue that these opinions are personal preferences and that personal preference is not a permissible basis for an expert opinion.
¶ 134. The circuit court reviewed Dr. Wener's discussion of the generally accepted risk factors of shoulder dystocia—elevated birth weight, maternal obesity, and gestational diabetes—and his application of these risk factors, in totality, to the facts of the instant case. The circuit court acknowledged that just as clinical medical practice entails evaluating a specific patient and applying known risk factors or variables, Dr. Wener's testimony analyzed Braylon's mother's prenatal care and the delivery of Braylon with respect to the three risk factors that he adduced at trial. The circuit court did not view Dr. Wener's testimony as stating a personal preference, but as based on reliable medical methods.
*582 ¶ 135. Furthermore, Dr. Wener's testimony regarding threshold glucose levels for gestational diabetes and macrosomia did not necessarily contradict the defendants' experts: Each offered a spectrum of ranges under which the risks warranted special care, and their spectrums overlapped. Any disagreement, ruled the circuit court, goes to the weight of Dr. Wener's testimony, not its admissibility.
f 136. For the reasons set forth by the circuit court, we conclude that the circuit court did not erroneously exercise its discretion in admitting Dr. Wener's testimony as reliable based on personal experiences and that Dr. Wener reliably applied his methodology to the facts. The circuit court kept the gate open to the opinion of Dr. Wener, a qualified OB-GYN. "[T]rial judges are gatekeepers, not armed guards."[51]
II
¶ 137. The second issue we must address is whether three remarks separately or together made by Braylon's counsel during his closing arguments prejudiced the defendants, justifying a new trial. We will set out each of the remarks and address each of the defendants' arguments for a new trial. Ultimately, we agree with the court of appeals that the circuit court *583 properly exercised its discretion by rejecting the defendants' motion for a new trial.
¶ 138. We begin by noting that although the defendants contemporaneously objected to Braylon's counsel's remarks, the defendants erred by failing to move for a mistrial. Generally, an offended party must object and then move for a mistrial to preserve a challenge to prejudicial remarks. Hansen v. State, 64 Wis. 2d 541, 551-52, 219 N.W.2d 246 (1974). The court of appeals nonetheless addressed this issue by exercising its discretionary authority. Seifert ex rel. Scoptur v. Balink, 2015 WI App 59, ¶ 36 n.10, 364 Wis. 2d 692, 869 N.W.2d 493 (citing Pophal v. Siverhus, 168 Wis. 2d 533, 545, 484 N.W.2d 555 (Ct. App. 1992)). We do the same.
¶ 139. We review a circuit court's decision to deny a motion for a new trial under an erroneous exercise of discretion standard.[52] An order for a new trial based on improper statements of counsel is appropriate if it " 'affirmatively appear[s]' that the remarks prejudiced the complaining party." Wausau Underwriters Ins. Co. v. Dane Cty., 142 Wis. 2d 315, 329-30, 417 N.W.2d 914 (Ct. App. 1987) (quoting Roeske v. Schmitt, 266 Wis. 557, 572, 64 N.W.2d 394 (1954)). This standard is satisfied when the circuit court is convinced that "the verdict reflects a result which in all probability would have been more favorable to the complaining party but for the improper argument."[53] Related to our review of a circuit court's *584 decision to deny the defendants' motion for a new trial is the assumption that "a properly given admonitory instruction is followed" and that "the jury acted according to law." State v. Pitsch, 124 Wis. 2d 628, 645 n.8, 369 N.W.2d 711 (1985) (citations omitted).
(1)
¶ 140. The defendants assert that Braylon's counsel made an impermissible and prejudicial reference to the rules of the road during his closing argument.[54] The following is Braylon's counsel's reference to the rules of the road during closing argument:
Thank you. Okay, well, on a nice, beautiful sunny day, clear skies, 65 miles an hour is probably fine. But there may be factors that you have to consider that would make that not fine. That would make you question whether that's the speed you should be going.
Let's say it's pouring rain, let's say it's snowing. You're not going to look at that number the same. And Dr. Wener, who I'll talk about in a moment, explained that to you. And this is the issue in this case about gestational diabetes.
No one is denying that they're throwing these two numbers out; 130 and 140. But what he tried to explain to you was when you have a big mom, who has an increased risk of gestational diabetes because of her weight, and an increased risk of a big baby because of her weight, you've got to consider which of these numbers you're going to use.
His point was what's safe at one speed might not be at another. And that you have to consider those issues.
*585 ¶ 141. The defendants made timely objections to these statements, which the circuit court overruled. The defendants also challenged these statements in their motion after the verdict. They argued that these statements violated the circuit court's order in limine and that the statements prejudicially confused the jury in regard to the applicable standard of reasonable care. The defendants asserted that as a result of Braylon's counsel's statements, "the jury was left with the impression that Dr. Wener's opinions regarding standards of care could be equated to speed limits and weather hazards on the roadway."
¶ 142. The circuit court rejected this argument. The circuit court decided that Braylon's counsel's analogy to driving a car in various weather conditions did not violate the order in limine. Instead, the circuit court interpreted Braylon's counsel's statement as "an attempt to analogize and to put into context Dr. Wen-er's theory of these additive elements as they pile up with the total being more than the sum of its parts," not as an analogy to ordinary negligence.
¶ 143. Further, in regard to the defendants' concern that the jury was confused as to the applicable standard of reasonable care, the circuit court concluded that the jury was not confused about the standard of care to apply:[55] The jurors were instructed to "find a standard of care for medical negligence." Jurors are assumed to follow jury instructions. Accordingly, the circuit court concluded that "there is no reason to believe" Braylon's counsel's statements were *586 prejudicial or could be interpreted by the jury in a way that would violate the in limine order.
¶ 144. The court of appeals agreed with the circuit court and concluded that Braylon's counsel did not violate the circuit court's order in limine and that counsel's analogy to drivers did not prejudice the defendants. The court of appeals reasoned that instead of comparing ordinary negligence and medical negligence, "the analogy illustrated the interplay of the alleged risk factors present in this case through a comparison to the interplay of various weather conditions that might affect a driver's decision-making process."[56]
¶ 145. Further, the court of appeals concluded that there was no indication that the absence of the analogy would have resulted in a different verdict. The analogy pertained to gestational diabetes testing thresholds, which was just one aspect of the evidence presented to the jury on the issue of the standard of reasonable care. The circuit court instructed the jury that its decision must be based only on the evidence presented to the jury and nothing else, including the statements of counsel.
f 146. We agree with the reasoning and conclusion of the court of appeals.
(2)
¶ 147. Turning to another remark of Braylon's counsel, the defendants assert that they were prejudiced because Braylon's counsel made an impermissible "Golden Rule" argument in violation of an order *587 in limine. "Golden Rule" arguments arise when counsel asks "the jurors to place themselves in the position of someone claiming injury or damage and ask[s] the jurors what they would want as compensation." State v. DeLain, 2004 WI App 79, ¶ 23, 272 Wis. 2d 356, 679 N.W.2d 562.
¶ 148. An order in limine prohibited Braylon's counsel from making statements that might suggest that the jury determine whether medical negligence occurred based on the jurors' own knowledge, experience, common sense, or what they would want or deserve.
f 149. The defendants assert that Braylon's counsel violated the order in limine when he stated:
Now, you heard some testimony from the defense experts, and I'll talk about them as I go along in this case as well and their bias, where they're coming from. You heard somebody actually get up on the witness stand and say—Dr. Rouse, I think it was—if it was 139, I wouldn't have done anything. Really? If it was 139, I would have done nothing different. Is that reasonable to you? Is that reasonable medicine to you? Is that how you want your doctor to care?
[[Image here]]
Is that what you want? You want a doctor to treat you, or you want a doctor to say, well, you're at 139. You're not at 140. No test for you. Or do you want a doctor to think about you?
¶ 150. The defendants' counsel objected to these remarks at trial, and Braylon's counsel withdrew the first remark. The circuit court sustained the defendants' objection to the second remark. The circuit court, however, did not strike either statement, opting instead to give a "curative" instruction.
*588 ¶ 151. The curative instruction followed counsel's remarking: "How do you want to be with your healthcare? Do you want to be a participant in your healthcare?" The curative instruction stated: "There aren't a lot of rules about what can and can't be argued, but one of them is that a lawyer may not ask a juror to place themselves in the position of the injured person or the doctor for that matter. Not sure that's what was going on, but if you got that idea, disregard it."
¶ 152. The defendants argued in their motion after the verdict that these "Golden Rule"-type statements were prejudicial and warranted a new trial. They argued that arguments involving what a juror would want from his or her doctor are irrelevant and appeal to the jurors' emotions. They further argued that involving jurors' personal feelings about the standard of care caused the jury to consider a standard of care inconsistent with the reasonable physician standard. They also argued that these statements violated the circuit court's order in limine.
¶ 153. The circuit court refused to order a new trial on "Golden Rule" grounds. The circuit court explained that Braylon's counsel's statements were "not [] classic "golden rule" violations, where the jurors were explicitly asked to place themselves in the position of the plaintiff." The circuit court noted that its curative instruction obviated any prejudice which may have resulted from Braylon's counsel's remarks. The circuit court denied the defendants' request for a new trial.
¶ 154. The circuit court is in the best position to evaluate "Golden Rule" statements and should look at a variety of factors such as "the nature of the case, the *589 emphasis upon the improper measuring stick, the reference in relation to the entire argument, [and] the likely impact or effect upon the jury." Rodriguez v. Slattery, 54 Wis. 2d 165, 170, 194 N.W.2d 817 (1972).
¶ 155. The court of appeals concluded that the circuit court did not erroneously exercise its discretion for the following reasons:
• These were not pure "Golden Rule" violations because the jurors were not asked to place themselves in the victim's shoes.
• Even if these remarks were "Golden Rule" violations, the circuit court gave the curative instruction stated above.
• The remarks, in light of the entire argument presented to the jury, did not affirmatively prejudice the defendants.[57]
¶ 156. We agree with the court of appeals' analysis that these remarks did not violate the order in limine.
f 157. In sum, because the circuit court properly considered objections to Braylon's counsel's statements during trial and after the verdict and provided a curative instruction, we conclude that the circuit court did not erroneously exercise its discretion by denying the defendants' motion for a new trial on the basis of these remarks.
(3)
¶ 158. Turning to their final challenge, the defendants argue that they were prejudiced by Braylon's *590 counsel's remarks (1) disparaging the defendants' attorney and (2) suggesting to the jurors that the jurors were experts.
¶ 159. The defendants refer to the following remarks:
• I spoke to you in my closing argument and I addressed issues. I didn't tell you what to do. I didn't tell you you're not experts. I didn't tell you you're not that smart. I didn't tell you don't know the law. Apparently I have a little more respect for you than Mr. Leib does.
• I've got a little more faith in you than he does, because he spent the last hour and a half telling you what to do, telling you what you can't do, telling you what you don't know and that you're not going to be experts—you're not going to know the information. I disagree.
• These are the kind of arguments you make to juries if you think they're not too smart. Fool you, scare you, you know? You people are from Lancaster. How smart could you be, right? I think you're pretty smart. I think you get it. I think you see through all this nonsense. I think you should be respected, not told what to do or fooled. You should be talked to like adults, make you own decisions about this case. Not be told what to do.
• This shell game, you know, this game that they're trying to play with you. You know, it's that game, you know, when you go to the fair? Where's the ball? Whoa, whoa, whoa, where's the ball? That's what they tried to do to you. It's a matter of respect. I don't do it to you. I'm giving you the information, you'll figure it out. I'm not telling you what to do. You're smart.
• So when Mr. Leib comes before you and makes his big grandstand move. Where's this one, where's *591 that one? Where's this one? Well, you know, it's just not true. It's a matter, again, of respect. It's a matter of respecting you as a group and trying to fool you. You're not going to get fooled. You're pretty damn smart. You're not going to get fooled. I don't think you'll get fooled.
• You have common sense and you can analyze the expert testimony and you're smart enough to do it. I'm like, again, I'm like Mr. Leib. I have a lot of faith in your smarts. I think you are experts in a sense. I think you've learned quite a bit and I think you can make good decisions. I don't have to tell you what to do or how to do it. I'm not going to do that. But think it through, ladies and gentlemen.
• Unlike Mr. Leib, I think you're smart people and I think you've learned the medicine and I think you are experts in a sense.
¶ 160. The circuit court concluded that, in context, these statements (and others of a similar vein) were not prejudicial or improper. The circuit court explained that these were rebuttal statements made in response to the defendants' "strenuous argument" and were meant to empower the jury to weigh the conflicting expert testimony and make the required credibility determinations.
¶ 161. The circuit court also explained that in a complex medical malpractice case filled with days of expert medical testimony, jurors have to make a finding based on medical evidence, so they do "in a sense become expert." The circuit court concluded there was nothing wrong with telling jurors that they are smart while simultaneously characterizing defense counsel's view of the jurors as that they are "dumb."
¶ 162. Considering the context in which these remarks arose, we conclude that the circuit court did *592 not erroneously exercise its discretion in ruling in favor of Braylon. Braylon's counsel's remarks were used to empower the jury to perform its essential role of weighing conflicting testimony and making credibility determinations.
¶ 163. The remarks at issue did not cause the jury to reach a decision that it would not have reached otherwise. Accordingly, we affirm the court of appeals' decision that the circuit court did not erroneously exercise its discretion in concluding that Braylon's counsel's remarks during closing argument did not constitute prejudicial error justifying a new trial.
¡-H HH I—I
¶ 164. Lastly, the defendants argue that this court should grant their motion for a new trial in the interests of justice under Wis. Stat. § 751.06.[58] They claim that justice was not served because the circuit court admitted Dr. Wener's unreliable testimony and did not order a new trial in response to Braylon's counsel's prejudicial remarks.
¶ 165. We have already concluded that the circuit court did not erroneously exercise its discretion by *593 admitting Dr. Wener's testimony or by failing to grant a new trial on the basis of Braylon's counsel's remarks. Nevertheless, we will elaborate further on Wis. Stat. § 751.06.
¶ 166. Under this court's interpretations, Wis. Stat. § 751.06 rarely calls for a new trial. This court has often expressed its "reluctan[ce] to grant a new trial in the interest of justice" and has stated that it "exercises its discretionary power only in exceptional cases." State v. Cuyler, 110 Wis. 2d 133, 141, 327 N.W.2d 662 (1983) (ordering new trial where trial court misread evidentiary statute and thus prohibited material witnesses from testifying). Such "exceptional" cases occur in two situations: (1) "when the real controversy has not been fully tried" and (2) "when it is probable that justice has for any reason been miscarried." Vollmer v. Luety, 156 Wis. 2d 1, 7, 456 N.W.2d 797 (1990).
¶ 167. The real controversy was fully tried in the instant case and there is no "substantial degree of probability that a different result was likely to be produced on retrial.[59]
f 168. For the reasons set forth, we affirm the decision of the court of appeals.
By the Court.—The decision of the court of appeals is affirmed.

 Seifert ex rel. Scoptur v. Balink, 2015 WI App 59, 364 Wis. 2d 692, 869 N.W.2d 493.

 All references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated.

 Wisconsin Stat. § 907.02(1) provides as follows, with emphasis added to show the new language added in 2011:
*538 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if the testimony is based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case.

 The case law uses the words "methodology" and "methods" interchangeably. See, e.g., Fuesting v. Zimmer, Inc., 421 F.3d 528, 535 (7th Cir. 2005), opinion vacated on other grounds on reh'g, 448 F.3d 936 (7th Cir. 2006) ("The district court must also, in keeping with its gatekeeper's duty, assess the reliability of the methodology the expert has employed in arriving at his opinion.").

 See Daniel D. Blinka, The Daubert Standard in Wisconsin: A Primer, Wis. Lawyer, Mar. 2011, at 61 ("Only when the witness identifies her principles and methods is the trial court in a position to assess their reliability").

 See Wis. Stat. § 893.55, which caps noneconomic damages at $750,000 in medical malpractice cases.

 See 2011 WI Act 2, WI S. Amend. Memo, 2011 Jan. Spec. Sess. S.B. 1 ("This language [in Wis. Stat. § 907.02(1)] is identical to the language of Rule 702 of the Federal Rules of Evidence."); State v. Giese, 2014 WI App 92, ¶ 17, 356 Wis. 2d 796; 854 N.W.2d 687 ("In January 2011, the legislature amended § 907.02 to make Wisconsin law on the admissibility of expert testimony consistent with 'the Daubert reliability standard embodied in Federal Rule of Evidence 702.'") (quoting State v. Kandutsch, 2011 WI 78, ¶ 26 n.7, 336 Wis. 2d 478, 799 N.W.2d 865).

 For discussion of pre-Daubert Wisconsin case law, see Daniel D. Blinka, Expert Testimony and the Relevancy Rule in the Age of Daubert, 90 Marq. L. Rev. 173 (2006).

 Frye v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923), stated the rule as follows:
The rule is that the opinions of experts or skilled witnesses are admissible in evidence in those cases in which the matter of inquiry is such that inexperienced persons are unlikely to prove capable of forming a correct judgment upon it... .
[[Image here]]
[Wlhile courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

 A law student commentator concluded that the Wisconsin Supreme Court nudged the relevancy standard closer to Daubert to the point that the relevancy standard became "Daubert lite," citing State v. Hibl, 2006 WI 52, ¶ 52, 290 Wis. 2d 595, 714 N.W.2d 194 (explaining that circuit courts have a limited gatekeeping function because the relevancy test requires a showing that the expert's opinion was "reliable enough to be probative"). Kristen Irgens, Wisconsin Is Open for Business or Business Just as Usual? The Practical Effects and Implications of 2011 Wisconsin Act 2, 2012 Wis. L. Rev. 1245, 1256-57.

 Blinka, supra note 5, at 19 ("[The Daubert reliability standard] is purportedly more liberal than the once-dominant general acceptance test ('too cold') yet more demanding than the relevancy standard ('too hot').").
*552 The post -Daubert case law indicates that rejecting expert testimony is "the exception rather than the rule." See Federal Rule Evidence 702 Advisory Committee Note (2000).

 In 2000, the following underlined language was added to Federal Rule of Evidence 702 to reflect Daubert:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise t, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
Federal Rule of Evidence 702 was also amended in 2011 "as part of the restyling of the Evidence Rules to make them more easily understood and to make style and terminology consistent throughout the rules," but no substantive changes were intended. Federal Rule of Evidence 702 Committee Notes (2011).
Federal Rule of Evidence 702 now provides:
A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

 Under the Rules Enabling Act, 28 U.S.C. § 2072, the United States Supreme Court is authorized to promulgate rules of practice and procedure for the federal courts. This *553 authority is exercised by the Judicial Conference of the United States. The Conference promulgates and changes rules of practice and procedure in the federal courts subject to oversight by the Court. For the Federal Rules of Evidence, the Judicial Conference is aided in its rule-making powers by the Evidence Advisory Committee; the members of and reporter to this Committee are appointed by the Chief Justice of the United States Supreme Court. Paul R. Rice and Neals-Erik William Delker, Federal Rules of Evidence Advisory Committee: A Short History of Too Little Consequence, 191 F.R.D. 678, 679 (2000).

 State v. Poly-America, Inc., 164 Wis. 2d 238, 246, 474 N.W.2d 770 (1991) ("When a state statute is modeled after a federal rule, we look to the federal interpretation of that rule for guidance and assistance.").

 The parties do not dispute that Dr. Wener was qualified as an expert and that his opinion was relevant in the instant case.

 Wisconsin Stat. § 907.02(1) states that testimony must be based on "reliable principles and methods." Only Dr. Wener's "method" is challenged in the instant case. For an illustration of the difference between principles and methods, the Federal Rule of Evidence 702 Advisory Committee Note (2000) gives the following illustration:
For example, when a law enforcement agent testifies regarding the use of code words in a drug transaction, the principle used by the agent is that participants in such transactions regularly use code words to conceal the nature of their activities. The method used by the agent is the application of extensive experience to analyze the meaning of the conversations. So long as the principles and methods are reliable and applied reliably to the facts of the case, this type of testimony should be admitted.
Several cases tend to collapse principles and methods into a singular "reliability" analysis.

 "Experts often disagree. A trial court's determination that the proffered testimony of one expert witness is reliable and helpful does not necessarily mean that the contradictory testimony of another witness, concerning the same subject matter by using a different methodology, is not also reliable *555 and helpful." 4 Jack B. Weinstein, Weinstein's Federal Evidence § 702.05 [3] (2d ed. 2011), citing Federal Rule of Evidence 702 Committee Note (2000).
"Since its inception, the courts have sought to apply Rule 702 in a manner that preserves the jury's traditional power to weigh evidence and determine witness credibility." 29 Charles Alan Wright & Victor Gold, Federal Practice and Procedure: Evidence, § 6268.2 (2d ed. 2016), citing DiCarlo v. Keller Ladders, Inc., 211 F.3d 465, 468 (8th Cir. 2000).

 "Many factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test." Daubert, 509 U.S. at 593.

 See commentary following the 2000 amendment to Federal Rule of Evidence 702. See also Blinka, supra note 5, at 19.

 "[W]e conclude that the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. That is to say, a trial court should consider the specific factors identified in Daubert where they are reasonable measures of the reliability of expert testimony." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999) (emphasis added). "[W]hether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." Kumho Tire, 526 U.S. at 153.

 Compare Federal Rule of Evidence 701 (firsthand knowledge requirement for witnesses) with Federal Rule of Evidence 703 (no firsthand knowledge requirement for experts).

 Blinka, supra note 5, at 61.

 See also Rosen v. Ciba-Geigy Corp., 78 F.3d 316, 318 (7th Cir. 1996) (The purpose of the rule announced in Daubert "was to make sure that when scientists testify in court they adhere to the same standards of intellectual rigor that are demanded in their professional work.").
*560 "Kumho at least made it clear that, in addition to gauging reliability in light of factors specific to the area of expertise involved, a trial court also may consider whether the expert's testimony holds together based on logic and common sense." 29 Wright & Gold, supra note 17, § 6267.

 Federal Rule of Evidence 702 Advisory Committee Note (2000).

 Federal Rule of Evidence 702 Advisory Committee Note (2000).

 "A supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in Daubert." Clark v. Takata Corp., 192 F.3d 750, 759 n.5 (7th Cir. 1999).

 Even when expert testimony relies on adequate principles, trial courts may still exclude the testimony when the methodology used to reach a conclusion based on those principles is unsupported. McGovern ex rel. McGovern v. Brigham & Women's Hosp., 584 F. Supp. 2d 418, 425-26 (D. Mass. 2008) (excluding expert's "opinion [that was] was connected to existing data about the risk of stroke after vacuum extraction only by his own ipse dixit"). The reliability standard requires an explanation of how the methodology used by the expert is derived from the witness's experience and led to the conclusion reached. McGovern, 384 F. Supp. 2d at 426.

 Blinka, supra note 5, at 60 (quoting Federal Rule of Evidence 702 Advisory Committee Note (2000)).

 Federal Rule of Evidence 702 Advisory Committee Note (2000).

 Sullivan v. U.S. Dep't of the Navy, 365 F.3d 827, 834 (9th Cir. 2004).

 Primiano v. Cook, 598 F.3d 558, 565 (9th Cir. 2010).

 Primiano v. Cook, 598 F.3d at 565 (quoting the "classic medical school text" Cecil Textbook of Medicine 1 (James B. Wyngaarden & Lloyd H. Smith Jr. eds., 17th ed. 1985)).

 United States v. Sandoval-Mendoza, 472 F.3d 645, 655 (9th Cir. 2006).

 Sandoval-Mendoza, 472 F.3d at 655.

 Primiano, 598 F.3d at 565 (quoting the "classic medical school text" Harrison's Principles of Internal Medicine 3 (Dennis L. Kasper et al. eds., 16th ed. 2005)).

 See, e.g., 29 Wright & Gold, supra note 17, § 6269.8 (medical expert "opinion[s] also may be based on extensive personal observations, professional experience, education, and training even where the medical expert has not conducted an epidemiological study and even where the expert's opinion is not generally accepted and is unsupported by peer review"); Sandoval-Mendoza, 472 F.3d at 656 (a well qualified physician with sufficient expertise could reliably testify about defendant's brain tumor to establish an entrapment defense); Primiano, 598 F.3d at 568 (abuse of discretion to exclude doctor's testimony in products liability case based on his experiences alone, but noting that medical literature had not addressed a similar situation).

 Sandoval-Mendoza, 472 F.3d at 655 (internal quotation marks & quoted source omitted).

 Sandoval-Mendoza, 472 F.3d at 655.

 Sandoval-Mendoza, 472 F.3d at 655 (quoting Kumho Tire, 526 U.S. at 149 (quoting Daubert, 509 U.S. 579, 592)); Zuchowicz v. United States, 140 F.3d 381 (2d Cir. 1998) (district court had discretion to admit opinions of clinical medical experts about cause of plaintiffs disease because they were based on methods reasonably relied on by clinical physicians, even though the drug had not been previously linked to that disease).
"In a non-scientific context, the reliability of an expert's methodology often will be a function of accepted practice in the area of expertise in question." 29 Wright & Gold, supra note 17, § 6268.1.

 Schneider ex rel. Estate of Schneider v. Fried, 320 F.3d 396 (3rd Cir. 2003), involved a claim that a decedent received cardiac care that fell below the standard of care. The court provided the following discussion in regard to this expert:
The record establishes that as an invasive cardiologist, who normally diagnoses heart conditions, Dr. Semigran was routinely present during surgical procedures and regularly advised inter-ventional cardiologists during the course of those procedures. Dr. Semigran also testified that he would consult with interventional cardiologists about which drugs should or should not be given to patients undergoing angioplasties.
Schneider, 320 F.3d at 406.

 Daubert, 509 U.S. at 590 ("Proposed testimony must be supported by appropriate validation—i.e., good grounds .. . .").

 Kumho Tire, 526 U.S. 137, 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."); Feliciano-Hill v. Principi, 439 F.3d 18, 24-25 (1st Cir. 2006) (physician's expert testimony met Daubert/Rvle 702 standards even though he failed to support his diagnosis with citations to published authorities; physician offered a "routine diagnosis" on patient he had examined, related to common condition well within his expertise); Bonner v. ISP Techs., Inc., 259 F.3d 924, 929 (8th Cir. 2001) ("There is no requirement that a medical expert must always cite published studies on general causation in order to *566 reliably conclude that a particular object caused a particular illness." (internal quotation marks & quoted source omitted)).
The defendants cite several cases for the proposition that to offer reliable testimony, Dr. Wener should have based his testimony on medical literature. The cases are distinguishable from the instant case. For example, although the court noted in Berk v. St. Vincent's Hospital & Medical Center, 380 F. Supp. 2d 334 (S.D.N.Y. 2005), that the excluded expert cited "no germane medical literature," the expert's report was excluded for other reasons: the expert's report was unsworn, was based on incorrect factual assumptions, and offered no methodology other than the expert's say-so. Berk, 380 F. Supp. 2d at 354-56. In contrast, Dr. Wener's testimony was given under oath; Dr. Wener relied on Braylon's and his mother's medical reports; Dr. Wener offered a clinical methodology that applied accepted risk factors to the facts of the instant case; and the defendants' experts offered testimony that actually supported Dr. Wener's testimony.

 The phrase "junk science" is ordinarily used as an epithet to refer to research or information that is not credible. See Kumho Tire, 526 U.S. at 159 (Scalia, J., concurring) {Kumho makes clear that the discretion it endorses is "discretion to choose among reasonable means of excluding expertise that is fausse and science that is junky.").

 The Wisconsin Medical Society and American Medical Association filed an amicus brief urging that this court "recog *567 nize that medical opinions supported by unsystematic clinical observations have reliability limited to those situations where physicians would not be expected to produce extrinsic support for their contentions but presumptively fail to cross the Daubert reliability threshold when tendered to establish the standard of care in a medical negligence claim." See Brief of Amicus Curiae Wisconsin Medical Society & American Medical Association at 9-10.
This argument is not supported in the case law. Expecting on-point medical literature to define a physician's standard of care in the penumbra of clinical situations is unreasonable. See Michelle M. Mello, Using Statistical Evidence to Prove the Malpractice Standard of Care: Bridging Legal, Clinical, and Statistical Thinking, 37 Wake Forest L. Rev. 821, 857 (2002). The author states:
For clinical scenarios involving a high degree of independent judgment and careful attention to the individual characteristics of each patient, expert opinion testimony tailored to the particular situation at issue in the malpractice case truly does have an advantage over reliance on practice guidelines or other standards formulated ex ante[,] . . . derived from a population of patients that may not resemble the plaintiff....
Id. at 846.

 "Shaky but admissible evidence is to be attacked by *568 cross examination, contrary evidence, and attention to burden of proof, not exclusion." Primiano, 598 F.3d at 564 (citing Daubert, 509 U.S. at 596).

 Blinka, supra note 5, at 19 (citing Kumho Tire, 526 U.S. at 152).

 "[T]he law grants the district court great discretion regarding the manner in which it conducts that evaluation" of the admissibility of expert testimony. "[W]e have not required that the Daubert inquiry take any specific form ... ." Lewis v. CITGO Petroleum Corp., 561 F.3d 698, 704 (2009).

 Blinka, supra note 5, at 19, 60 (citing Federal Rule Evidence 702 Advisory Committee Note (2000)).

 In Kumho Tire, the Supreme Court held that trial courts have great latitude in determining the methods by which they test the reliability of expert testimony. Indeed the federal abuse of discretion standard "applies as much to the trial court's decisions about how to determine reliability as to its ultimate conclusion." United States v. Charley, 189 F.3d 1251, 1261 n.11 (10th Cir. 1999) (quoting Kumho Tire, 526 U.S. at 152). "[T]he law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." Kumho Tire, 526 U.S. at 142. See also Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997) ("abuse of discretion is the proper standard by which to review a district court's order to admit or exclude scientific evidence.").
*570 "Our case law has recognized that experts in various fields may rely properly on a wide variety of sources and may employ a similarly wide choice of methodologies in developing an expert opinion." Cooper v. Carl A. Nelson & Co., 211 F.3d 1008, 1020 (7th Cir. 2000).

 The federal cases state: "An abuse of discretion may occur as a result of an errant conclusion of law, an improper application of law to fact, or a clearly erroneous finding of fact." McDowell v. Philadelphia Housing Auth., 423 F.3d 233, 238 (3d Cir. 2005).
In Wisconsin, the cases use the phrase "erroneous exercise of discretion" in place of the phrase "abuse of discretion." The two phrases are equivalent. We did not change the standard of review, just the locution. We concluded that the term "abuse of discretion" carries unjustified negative connotations. City of Brookfield v. Milwaukee Metro. Sewerage Dist., 171 Wis. 2d 400, 423, 491 N.W.2d 484, 493 (1992). See King v. King, 224 Wis. 2d 235, 248, 590 N.W.2d 480 (1999) ("A circuit court erroneously exercises its discretion if it makes an error of law or neglects to base its decision upon facts in the record."); Hartung v. Hartung, 102 Wis. 2d 58, 66, 306 N.W.2d 16 (1981):
A discretionary determination. .. must demonstrably be made and based upon the facts appearing in the record!,] in reliance on the appropriate and applicable law[,] . .. and most importantly, a discretionary determination must be the product of a rational mental process by which the facts of record and law relied upon are stated and are considered together for the purpose of achieving a reasoned and reasonable determination.

 29 Wright & Gold, supra note 17, § 6268.2 (citing Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co., 161 F.3d 77, 86 (1st Cir. 1998)).
See Guild v. Gen. Motors Corp., 53 F. Supp. 2d 363 (W.D.N.Y. 1999) ("[T]rial judges acting as gatekeepers under Daubert must not assume 'the role of St. Peter at the gates of heaven, performing a searching inquiry into the depth of an expert witness's soul' and thereby usurp 'the ageless role of the jury' in evaluating witness credibility and weight of the evidence." (quoted source omitted)).

 Wagner v. Am. Family Mut. Ins. Co., 65 Wis. 2d 243, 249, 222 N.W.2d 652 (1974).

 Wagner, 65 Wis. 2d at 249.

 The circuit court granted a motion in limine to prohibit Braylon's counsel from analogizing medical negligence to the failure of a driver to follow the rules of the road.

 The circuit court also noted, "We have to remember that the juror's [sic] don't even know what regular negligence is, probably. They weren't instructed on regular negligence. . . . They were given one instruction."

 Seifert, 364 Wis. 2d 692, ¶ 40.

 Seifert, 364 Wis. 2d 692, ¶ 46.

 Wisconsin Stat. § 751.06 provides:
Discretionary reversal. In an appeal in the supreme court, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from, regardless of whether the proper motion or objection appears in the record, and may direct the entry of the proper judgment or remit the case to the trial court for the entry of the proper judgment or for a new trial, and direct the making of such amendments in the pleadings and the adoption of such procedure in that court, not inconsistent with statutes or rules, as are necessary to accomplish the ends of justice.

 Discretionary reversals based on a miscarriage of justice are appropriate when this court "determine [s] to a substantial degree of probability that a different result was likely to be produced on retrial." State v. Wyss, 124 Wis. 2d 681, 741, 370 N.W.2d 745 (1985).