# COURT OF APPEALS
## DECISION
## DATED AND FILED

## July 25, 2023

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.    2022AP1014**

**STATE OF WISCONSIN**

Cir. Ct. No.  2017CV6330

**IN COURT OF APPEALS**
**DISTRICT I**

NICKEY MONCEL,

        PLAINTIFF-RESPONDENT,

PATRICIA MONCEL,

        PLAINTIFF,

    V.

FLAVOR DEVELOPMENT CORP,

        DEFENDANT-APPELLANT,

SENTREX INGREDIENTS, LLC,

        DEFENDANT.

        APPEAL from a judgment of the circuit court for Milwaukee County:  WILLIAM SOSNAY, Judge.  *Affirmed*.

Before Brash, C.J., Donald, P.J., and White, J.

¶1 WHITE, J. Flavor Development Corporation (Flavor Development) appeals the judgment, entered after a jury's verdict that found it liable for over $5.3 million in damages to Nickey Moncel for a defective and dangerous product it produced, and that Moncel was exposed to on his job at a coffee roaster. Flavor Development argues that the trial court erroneously admitted testimony from three medical expert witnesses and that the evidence at trial was insufficient to prove causation, liability, and injury. Additionally, it argues that Moncel's counsel's closing argument was improper and prejudicial. Upon review, we reject all of Flavor Development's arguments, and accordingly, we affirm.

## BACKGROUND

¶2 In July 2017, Moncel filed a complaint against Flavor Development, a complaint which he amended in August 2018.[1] Moncel alleged negligence; three counts related to strict product liability, including failure to warn and failure to instruct; civil conspiracy; and a violation of the deceptive trade practices act. All counts related to his employment at a coffee roasting plant, Midwest Roasters, LLC, in Hayward. Moncel alleged that he had been injured by exposure to the chemical diacetyl in flavoring that had been supplied by Flavor Development to Midwest Roasters.

---

[1] Multiple other companies were named in the original and amended complaint, but were later dismissed. Further, in January 2021, Moncel's wife's original loss of consortium claim was also dismissed.

¶3    In March 2021, the circuit court[2] denied Flavor Development's motion for summary judgment on Moncel's negligence and strict liability claims. It also denied Flavor Development's motion to exclude the testimony of Moncel's expert witness, Dr. Charles Pue. In June 2021, the circuit court addressed the motions *in limine* brought by the parties, which included several to exclude or limit expert witness testimony under ***Daubert***.[3]    The court denied Flavor Development's motions to exclude two of Moncel's expert witnesses: Dr. Rose A. Franco and Dr. Robert Harrison.

¶4    The case proceeded to a jury trial in January 2022.[4] Moncel began by presenting video deposition testimony from Joseph Staffieri, president of Flavor Development; David Straus, a senior flavor chemist; Rod Peters of Midwest Roasters; and Theresa Peters of Midwest Roasters. Moncel then testified about his prior recreational and family activities, his history of smoking, his diagnoses of heart problems and diabetes in the early 2000s, and his decision to take better care of himself after bypass surgery. Moncel began working at Midwest Roasters in 2008 and ended in 2015; he was the primary employee who flavored the coffee beans roasted on site. He testified that he neither received training on safety while working with the flavoring agents nor did he see safety data sheets on the chemicals involved. He pursued medical treatment for worsening breathing and lung function problems.

---

[2] The Honorable William S. Pocan presided over pretrial proceedings, including motions in limine. We refer to Judge Pocan as the circuit court.

[3] ***Daubert v. Merrell Dow Pharms., Inc.***, 509 U.S. 579 (1993).

[4] The Honorable William Sosnay presided over the trial and post trial proceedings. We refer to Judge Sosnay as the trial court.

¶5     Moncel called family witnesses including his children and wife, who discussed his lifestyle changes in wake of his breathing issues.  He called two witnesses who discussed the financial impact of his care needs and his future loss of earnings.  Moncel also called three medical witnesses:  Dr. Harrison, Dr. Franco, and Dr. Pue.

¶6     Dr. Harrison testified that he was an occupational medicine specialist who had conducted research on lung disease caused by diacetyl.  He explained that the National Institute for Occupational Safety and Health (NIOSH) has tested multiple coffee roasting and coffee flavoring companies, and that the cases of lung disease only occur among workers who are flavoring coffee.  Dr. Harrison opined that diacetyl is a toxic and dangerous chemical and concluded to a reasonable degree of medical certainty that diacetyl causes lung disease.

¶7     Dr. Franco, a pulmonologist at the Medical College of Wisconsin, testified that she has treated Moncel since June 2016.  She testified that Moncel complained he had gradual increase in shortness of breath upon walking, beginning three to four years prior, and he sought a second opinion of a dyspnea diagnosis.  Dr. Franco conducted a pulmonary function test that showed Moncel's lung function was fifty percent; she diagnosed him with moderate to severe pulmonary obstruction disease.  Due to the timing of the development of his symptoms, she attributed his severe persistent asthma to occupational exposure in his coffee roasting position, not some of the other common allergic causes or asthma or his past history with smoking.  Based on her research and the information provided by Moncel, Dr. Franco opined that the coffee roasting with "significant vapor exposure" to diacetyl was causative of Moncel's lung condition.  She noted that Moncel's breathing function has not improved with treatment and remains at about fifty percent.

¶8     Dr. Pue, a specialist in pulmonary and critical care medicine, testified that diacetyl "causes damage to the lining of the airway" which forms scar tissue and "obliterates the airway and closes it off." Dr. Pue examined Moncel in 2016, diagnosing him with "*bronchiolitis obliterans* or flavor-related lung disease as a result of being exposed to diacetyl." He explained that these diacetyl-related lung diseases presented in various speeds and intensity, but the normal development he saw was an "insidious development that occurs depending on how much exposure you're getting over time." Dr. Pue testified that Moncel had not shown improvement with the aggressive asthma medication treatment prescribed by Dr. Franco, which should have shown improvement if he had an allergy-based asthma. Dr. Pue believed that bronchiolitis obliterans was a diagnosis more consistent with his case, but that Dr. Franco's diagnosis of severe persistent asthma was "quibbling over labels" because they were "both obstruction diseases."

¶9     In its defense, Flavor Development called Joseph Staffieri, president of Flavor Development, and Edward Brennan, Flavor Development's operations manager since 2001. It also called expert witnesses: Dr. Brent Kerger, a toxicologist; Peter Harnett, an industrial hygiene consultant; and Dr. Robert McCunney, an occupational and environmental medicine specialist.

¶10     The jury returned a verdict in Moncel's favor. The jury answered "Yes" to questions one and two that found that Flavor Development's flavorings were "in such a defective condition as to be unreasonably dangerous to a person" and that "the defective condition [was] a cause of the injury" The jury attributed 100% of the "total responsibility for the defective condition of the product" to Flavor Development. It found Midwest Roasters not to be negligent. The jury determined that the sum of money that "will fairly and reasonably compensate"

Moncel for his damages totaled $5.3 million, divided between past and future pain, suffering, and disability, and future medical and health care expenses.

¶11     After the verdict, Flavor Development filed a post-trial motion for judgment notwithstanding the verdict, to change a verdict answer on question one, and to reduce the excessive damages awarded. After oral argument during a hearing in April 2021, the trial court affirmed the verdicts and denied Flavor Development's post-trial motions.

¶12     Flavor Development appeals.

## DISCUSSION

¶13     Flavor Development makes three arguments on appeals. First, it argues that the trial court erroneously exercised its discretion when it admitted the testimony of Dr. Harrison, Moncel's general causation expert witness; Dr. Franco, Moncel's causation expert witness; and Dr. Pue, Moncel's specific causation expert witness. Second, Flavor Development argues that Moncel's evidence was insufficient to establish causation or to establish defective design or to establish Flavor's liability based on failure to warn. Third, it contends that Moncel's counsel's closing argument was improper and prejudicial, requiring a new trial. We will address each argument below.

### I.    Expert witnesses

¶14    Expert witness testimony is governed by WIS. STAT. § 907.02 (2021-22),[5] which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if the testimony is based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case.

Sec. 907.02(1).  An appellate court's review of a trial court's admission of expert witness testimony is guided by a two part test:  first, whether the trial court applied the proper legal standard; and second, whether the trial court "properly exercised its discretion in determining which factors should be considered in assessing reliability, and in applying the reliability standard to determine whether to admit or exclude evidence under []§ 907.02(1)." *Seifert v. Balink*, 2017 WI 2, ¶90, 372 Wis. 2d 525, 888 N.W.2d 816 (footnote omitted).  "We examine the [trial] court's rulings both independently as a question of law and also under the erroneous exercise of discretion standard." *Id.*, ¶88.

¶15    Here, we begin by noting the connected nature of Flavor Development's arguments—that Moncel's evidence is insufficient to support his claims because his expert testimony is unreliable and should have been excluded.  When a court conducts an inquiry into the exclusion of an expert witness under *Daubert*, it generally is relying on the expert's report and planned testimony.  For

---

[5] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

a court conducting such an analysis, "[t]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993). We note that Flavor Development disputes, vigorously, the substance of Moncel's expert witnesses' testimony. However, we will address the arguments as offered.

### A. Standard of law

¶16    We begin with whether the trial court applied the correct standard of law.[6] Flavor Development argues that the trial court applied the wrong standard for the admissibility of expert testimony. It argues that the trial court failed to perform its gatekeeping function to ensure that an expert presents reliable testimony. For this argument, we return to the record.

¶17    The circuit court denied Flavor Development's motions to exclude Moncel's medical expert witnesses at hearings in March and June 2021. In the first hearing regarding Dr. Pue, the circuit court began with WIS. STAT. § 907.02(1). The circuit court also relied upon *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 839 (7th Cir. 2015), where the Seventh Circuit adopted the position that a rigorous differential diagnosis may be sufficient to help prove general and specific causation.

¶18    In the second hearing, which included discussions on Dr. Franco and Dr. Harrison, the court again discussed its considerations under WIS. STAT. § 907.02. The court explained its approach to the expert witnesses as follows:

---

[6] We note that the trial court, Judge Sosnay, admitted the expert testimony at trial, with reliance and consideration of the ruling on the motions to exclude expert witness testimony issued by the circuit court, Judge Pocan.

> And what we are trying to avoid is that this sort of jury, you should believe the experts because they are really smart persons with lots of initials after their name. But as long as there is some support behind what their opinion is, it should be a fair game … to be allowed and then for cross-examination.
>
> So, it doesn't mean that all testimony and all experts are going to be allowed.

The court stated that in its "reading of *Daubert* and it's for the most part, unless something unusual is going on with a particular expert, it's really a matter of cross-examination."

¶19 The record reflects that the circuit court conducted hearings to determine witness reliability under *Daubert* and WIS. STAT. § 907.02 and it applied this law to its considerations of the expert testimony proposed. As the United States Supreme Court explained when it set forth the analysis for Federal Rule of Evidence 702 in the *Daubert* decision: "[t]he inquiry envisioned by Rule 702 is … a flexible one. Its overarching subject is the scientific validity and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission." *Daubert*, 509 U.S. at 594-95. Our examination of the record supports that the circuit court considered the qualifications of the experts and their methodology and determined that Flavor Development's issues with the expert testimony could be adequately addressed through cross examination. When the admission of these expert witnesses was raised at trial, the trial court referenced the circuit court's previous analysis and restrictions. "Instead of exclusion, the appropriate means of attacking 'shaky but admissible' experience-based medical expert testimony is by '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof....'" *Seifert*, 372 Wis. 2d 525, ¶86 (quoting *Daubert*, 509 U.S. at 597). That is precisely what

the circuit court envisioned and the trial court allowed. Therefore, we conclude as a matter of law, the trial court applied the proper standard of law.

### B. Discretionary decision to admit expert testimony

¶20 Accordingly, we now consider whether the trial court's decision to admit Moncel's three medical expert witnesses' testimony during the trial was an erroneous exercise of discretion. Flavor Development contends that the circuit court's pretrial analysis fell short because the court did not conduct an exhaustive review and there was no written explanation of the court's findings. We disagree that a written analysis was required. Our supreme court concluded that "***Daubert's*** role of ensuring that the courtroom door remains closed to junk science is not served by excluding medical expert testimony that is supported by extensive relevant medical experience. Such exclusion is rarely justified in cases involving medical experts." *Seifert*, 372 Wis. 2d 525, ¶85.

¶21 Our examination of the record supports that the circuit court's analysis was thorough and sufficient under WIS. STAT. § 907.02(1). We begin with Dr. Harrison, because his general causation analysis is the focus of many of Flavor Development's complaints.

### 1. Dr. Harrison

¶22 The circuit court analyzed Flavor Development's challenge to Dr. Harrison in June 2021. Flavor Development objected that Dr. Harrison did not take his general opinions about diacetyl, lung disease, and causation, and specifically apply them to Moncel. Moncel's counsel argued that a general causation expert would not reach a diagnosis about Moncel himself, but instead whether "the chemicals at issue were capable of causing the disease." The circuit

court concluded that Dr. Harrison would be able to testify generally, and it "would be a matter for cross-examination as long as [he] kept those opinions general, and not specific." When Flavor Development again raised a concern that Dr. Harrison did not specifically analyze "how the flavors … made in Flavor Development's flavors … were used by Nickey Moncel in his specific type of work exposure[.]" The trial court admitted Dr. Harrison, but ruled that it would allow "very limited testimony" with care not to give "the appearance that he analyzed the specific circumstances and amounts that relate to Mr. Moncel."

¶23     On appeal, Flavor Development argues that: (1) Dr. Harrison did not satisfy the general causation standard because he did not opine to the level of diacetyl exposure capable of causing human lung disease, such as that claimed by Moncel; (2) he did not opine on the level of diacetyl exposure that could cause bronchiolitis obliterans; and (3) he did not differentiate "background diacetyl" from sources other than Moncel's job at Midwest Roasters.[7] While Flavor Development acknowledges that diacetyl is capable of causing health problems in humans, its critique of Dr. Harrison is that he did not quantify that relationship and specifically engage those measurements to Moncel's experience.

---

[7] During trial, Flavor Development also noted that Dr. Harrison's opinion had been recently excluded in an Iowa federal district court. Moncel's counsel argued that the Iowa court misapplied the standard. He asserted that Dr. Harrison had testified in approximately twelve trials and his authored reports had "not been thrown out dozens and dozens of times." The trial court ruled that it was acceptable during cross-examination for Flavor Development to ask Dr. Harrison if he had been barred in other courts because it would arguably be relevant to his credibility. On appeal, Flavor Development argues that Dr. Harrison's opinion is unreliable for the same reasons it was excluded in Iowa. An evidentiary decision in an Iowa court is not binding authority and we decline to attempt to apply those cases to this matter. It was within the trial court's discretion to allow Dr. Harrison to testify and we will not disturb the court's discretion on this basis.

¶24  Moncel responds that the trial court acted within its discretion to admit Dr. Harrison's testimony because he relied upon his experience and qualifications to present a thorough and careful analysis using the Bradford Hill[8] methodology that is widely-accepted as reliable under *Daubert*. *See In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d 1102, 1116 (N.D. Cal. 2018). Further, Moncel asserts that Dr. Harrison's opinion was supported by more than fifty studies that showed diacetyl causes obstructive lung disease.

### 2. Dr. Franco

¶25  In the same hearing in June 2021, Flavor Development moved to exclude Dr. Franco's testimony. Flavor Development argued she did not make a differential diagnosis of Moncel. In her deposition, she stated that her causal connection was based on an article that high dose exposure to diacetyl can cause disease. Flavor argued that Dr. Franco did not determine whether Moncel had a high dose exposure to diacetyl. However, Moncel argued Dr. Franco did not have to just render a differential diagnosis. She could apply "credible experience" as a treating physician and thirty years of pulmonary medicine experience to her diagnosis of Moncel's lung disease. In addition, she relied upon medical literature articles and she brought those articles to her deposition. The circuit court

---

[8] Our review of case law does not show that the Bradford Hill factors have been relied upon in Wisconsin; however, that does not negate Dr. Harrison's expert testimony as fulfilling its function under WIS. STAT. § 907.02(1) to assist the jury in understanding the evidence presented. In the case upon which Moncel relies for this argument, the factors have been identified as "(1) the strength of the association; (2) consistency; (3) specificity; (4) temporality; (5) biological gradient or dose response; (6) biological plausibility; (7) coherence with other scientific knowledge; (8) experimental evidence; and (9) analogy." *In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d 1102, 1116 (N.D. Cal. 2018).

concluded that Dr. Franco was "qualified" and that Flavor Development's points of opposition to her admission were "fair game for cross-examination."

¶26 On appeal, Flavor Development argues that the trial court erred when it admitted Dr. Franco's testimony because her opinions lacked foundation or methodology, and she failed to rule out alternate causes of Moncel's illness. It asserts that her methodology was insufficient because she relied upon Moncel's reports of the coffee roasting and flavoring process, she did not quantify whether Moncel had been exposed to high doses of diacetyl, and she could not specifically separate whether the coffee dust in the air at Midwest Roasters or the diacetyl in the flavorings caused Moncel's asthma.

¶27 Moncel responds that Dr. Franco's methodology was sound because it relied on her more than thirty years of experience as a pulmonologist, a normal reliance for medical experts, and her reliance on Moncel's self-reporting was entirely normal in recording a medical patient's history. Further, Moncel contends that Flavor Development mischaracterizes the record in two respects: first, Dr. Franco's testimony was not based on her experience alone, but she also relied on her research into medical literature on the relationship between diacetyl and lung disease. Second, with regard to the cause of Moncel's asthma—she acknowledged that she could not specifically state it was the diacetyl in the flavorings "alone" that caused his lung disease. She still concluded that diacetyl was the primary cause of Moncel's obstructive lung disorder.

### 3. Dr. Pue

¶28 The motion to exclude Dr. Pue occurred in March 2021, where Flavor Development argued that Dr. Pue did not specifically connect the idea that diacetyl can cause lung disease to the idea that diacetyl caused Moncel's lung

issues, in other words, that Moncel "was exposed to 'X' amount of the chemical, therefore, it is this disease." However, the circuit court concluded that Dr. Pue based his opinion on medical literature and his experience that Moncel's "work involved the exposures to flavorings that workers get exposed to at these types of plants." The court dismissed Flavor Development's argument that Dr. Pue needed to specifically analyze "the amount of alpha-diketones" used in the flavoring, but the court held that Dr. Pue could still "offer an analysis on cause despite the lack of hard evidence of the level of exposure according to the persuasive logic of the Third Circuit" in *Heller v. Shaw Indus., Inc.*, 167 F.3d 146 (3d Cir. 1999).[9]

¶29 On appeal, Flavor Development argues that the trial court erred when it admitted Dr. Pue's testimony because his "differential-diagnosis" lacked proper methodology. It asserts he lacked evidence to support his diagnosis that Moncel had bronchiolitis obliterans or that diacetyl was the cause of Moncel's lung condition or bronchiolitis obliterans. It argued his specific causation analysis failed because Dr. Harrison's general causation testimony was insufficient, that he employed circular reasoning that any exposure to diacetyl was capable of causing bronchiolitis obliterans, therefore, Moncel had bronchiolitis obliterans from diacetyl exposure. Flavor Development also argues that Dr. Pue had no basis to differentiate his bronchiolitis obliterans diagnosis from Dr. Franco's severe persistent asthma diagnosis. It contends that Dr. Pue had no basis to assert that the delayed onset of lung disease could occur with toxic diacetyl exposure, which

---

[9] The Third Circuit explained that it did not interpret the United States Supreme Court to "require[e] a medical expert to always rely on published studies indicating the exposure necessary to cause a particular illness." *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999).

Flavor Development's expert witness testified would show immediate burning of eyes, nose, throat, and beyond.

¶30 Moncel responds that Dr. Pue performed a proper differential diagnosis, by systemically evaluating and ruling out possible causes of his lung disorder. Dr. Pue ruled out Moncel's prior smoking history, smoke from the coffee roasting process, excessive dust exposure, allergy-induced asthma, chronic obstructive pulmonary disease, heart problems, gastroesophageal reflux, and obesity. After eliminating those possibilities, Dr. Pue considered Moncel's exposure to flavorings containing diacetyl and that the onset of his disease matched the progression of diacetyl-induced illness seen in many of his other patients. Further, Moncel argued that Dr. Pue did not rely solely on his differential diagnosis, but on his multiple years of study of how diacetyl causes lung damage as well as studies in medical literature. Moncel argues that the differences between Dr. Pue and Dr. Franco in the label of his illness is a distinction without a difference because they both see the cause of his illness arising out of his occupational exposure. Finally, he asserts that the disagreement by experts over the temporal development after diacetyl exposure is a matter for the jury, not a sign that Dr. Pue is unreliable.

¶31 Upon our review of the record, we conclude that the trial court properly exercised its discretion when it admitted the testimony of Moncel's three expert medical witnesses. "Admissibility of expert testimony is generally within the discretion of the trial court." *Estate of Hegarty ex rel. Hegarty v. Beauchaine*, 2006 WI App 248, ¶154, 297 Wis. 2d 70, 727 N.W.2d 857. The circuit court considered the experts' experience and methodology. "In expert medical evidence, the methodology often relies on judgment based on the witness's knowledge and experience." *Seifert*, 372 Wis. 2d 525, ¶123. The court

determined that the experts were qualified and their testimony reliable to assist the jury in understanding the evidence presented. Accordingly, the trial court properly exercised its discretion when it admitted the testimony of Dr. Pue, Dr. Franco, and Dr. Harrison. As a result, we decline Flavor Development's request to change the jury verdicts on questions one and two from "yes" to "no."

## II. *Sufficiency of the evidence*

¶32 Flavor Development argues that the evidence Moncel presented at trial was insufficient for two primary reasons. First, it argues that Moncel failed to present admissible expert testimony; therefore, he could not establish causation. Accordingly, it contends that the jury verdicts for the first two questions should be changed from "yes" to "no." Second, he argues that the evidence was insufficient to establish a defective design of Flavor Development's flavorings or to prove Flavor Development's liability based on failure to warn. In relation to the second issue, Flavor Development asserts that the verdict form combined the defective design and failure to warn theories into one question; therefore, it would be entitled to a new trial on liability if this court concludes that only one of these issues warrants changing the jury verdict.

¶33 A motion challenging the sufficiency of the evidence as a matter of law to support a verdict may be granted when "the court is satisfied that, considering all credible evidence and reasonable inferences therefrom in the light most favorable to the party against whom the motion is made, there is no credible evidence to sustain a finding in favor of such party." WIS. STAT. § 805.14(1). "When considering a motion to change the jury's answers to verdict questions, we view the evidence in the light most favorable to the verdict and affirm the verdict

16

if it is supported by any credible evidence." ***Kubichek v. Kotecki***, 332 Wis. 2d 522, 537, 796 N.W.2d 858 (Ct. App. 2011).

### A. *Causation*

¶34 Flavor Development's causation claim relies heavily on its challenge to the admission of Moncel's medical expert witnesses. To prove a toxic-torts case such as the one alleged by Moncel, the plaintiff must present experts to prove causation because the facts are outside of a jury's knowledge. *See **C.W. ex rel. Wood***, 807 F.3d at 838. "To establish causation in Wisconsin, the plaintiff bears the burden of proving that the defendant's negligence was a substantial factor in causing the plaintiff's harm." ***Ehlinger by Ehlinger v. Sipes***, 155 Wis. 2d 1, 12, 454 N.W.2d 754 (1990). "The phrase 'substantial factor' denotes that the defendant's conduct has such an effect in producing the harm as to lead the trier of fact, as a reasonable person, to regard it as a cause, using that word in the popular sense." ***Id.*** (citation omitted). There may be more than one substantial factor to cause the injury; the test is one of "significance rather than quantum." ***Id.*** at 12-13.

¶35 Based on our conclusion above that the admission of the expert testimony was within the trial court's discretion, we rely on that evidence. This court looks for any "credible evidence to sustain the jury's verdict"; we do not "search the record for evidence to sustain a verdict that the jury could have reached, but did not." ***City of Milwaukee v. NL Indus.***, 2008 WI App 181, ¶21, 315 Wis. 2d 443, 762 N.W.2d 757 (citation omitted).

¶36 The record reflects that Moncel presented Dr. Harrison's opinion that diacetyl is a toxic and dangerous chemical and his conclusion to a reasonable degree of medical certainty that diacetyl causes lung disease. Dr. Harrison relied

upon NIOSH testing and studies on multiple coffee roasting and coffee flavoring companies, which showed that the cases of lung disease only occur among workers who are flavoring coffee. Moncel presented the testimony of Dr. Franco, who conducted his pulmonary fitness testing that showed his lung function at fifty percent, a level that did not improve after treatment. Dr. Franco testified that the timing of the development of his symptoms meant that his severe persistent asthma arose from occupational exposure in his coffee roasting position, not some of the other common allergic causes or asthma or his past history with smoking. Dr. Franco opined that the coffee roasting with significant vapor exposure to diacetyl was causative of Moncel's lung condition. Moncel presented Dr. Pue, who diagnosed Moncel with "bronchiolitis obliterans or flavor-related lung disease as a result of being exposed to diacetyl" in 2016. Dr. Pue opined that diacetyl related lung diseases presented in various speeds and intensity, but the normal development he saw was an "insidious development that occurs depending on how much exposure you're getting over time," which he considered consistent with Moncel's work history.

¶37 We conclude that viewing the evidence in the light most favorable to the jury's verdict, there was credible evidence to support the verdict. While Flavor Development argues that the evidence was not specific or scientific enough to prove causation, the jury was not required to find that Flavor Development was the only cause of Moncel's illness, in fact, another cause may also be a "substantial factor in contributing to the result." *Ehlinger*, 155 Wis. 2d at 13. Further, there was no requirement that Moncel had to prove a sufficient quantity of exposure. Accordingly, we will not disturb the jury's verdict on questions one and two.

*B. Liability findings: defective design and failure to warn*

¶38   Flavor Development argues that Moncel failed to present sufficient evidence of its liability under either the defective design or failure to warn theories. A manufacturer is liable under Wisconsin law for a defective product that "contains a manufacturing defect, is defective in design, or is defective because of inadequate instructions or warnings." WIS. STAT. § 895.047(1)(a).

¶39   Moncel argues that there was credible evidence upon which the jury could find that Flavor Development's diacetyl-containing flavorings were defective in design. Under Wisconsin law, "[a] product is defective in design if the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the manufacturer and the omission of the alternative design renders the product not reasonably safe." WIS. STAT. § 895.047(1)(a). Moncel contends that there is little dispute that diacetyl is dangerous and causes obstructive lung diseases. He relies on Dr. Harrison's testimony about NIOSH studies that examined the dangers of diacetyl going back to 2000, with more than fifty peer-reviewed scientific studies regarding the effects and dangers of diacetyl being published since then.

¶40   The president and chief chemist of Flavor Development each acknowledged the danger of diacetyl in their testimony. Moncel asserts that with knowledge of the dangers of diacetyl, Flavor Development could have chosen to develop flavoring without this chemical; however, it did not remove diacetyl from its flavorings until 2012. Nonetheless, Flavor Development contends that no witness testified that any amount of diacetyl in a product was not reasonably safe. Further, it argues that no one analyzed the contents of Flavor Development's flavorings and opined on the diacetyl risk. However, the record reflects that

Flavor Development's president, operations manager, and its expert toxicologist each testified that Moncel was exposed to diacetyl from its flavoring products at percentages higher than the NIOSH guidelines. While Flavor Development relies on the fact that NIOSH's guidelines are not law; nonetheless, Moncel presented sufficient evidence to the jury to allow it to find that diacetyl was not reasonably safe, but in fact, dangerous and defective.

¶41 Flavor Development's second argument is that there was not sufficient evidence for the jury to find that there was a failure to warn. "A product is defective because of inadequate instructions or warnings only if the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the manufacturer and the omission of the instructions or warnings renders the product not reasonably safe." WIS. STAT. § 895.047(1)(a). Flavor Development again asserts that Moncel failed to show that any level of diacetyl was not reasonably safe. We again conclude there was credible evidence presented upon which the jury could have made this finding.

¶42 Flavor Development also argues that Moncel failed to show there was an omission of warning. Turning to the record: Moncel testified that he opened the boxes of flavoring from Flavor Development and he never saw a warning about diacetyl. One of the owners of Midwest Roasters testified that she did not recall the contents of the safety data sheets that accompanied the Flavor Development flavoring products.[10] Midwest Roaster's owners both testified in

---

[10] The record reflects that Flavor Development's operations manager testified that the safety data sheets were overwritten when they were revised over the years; therefore, the actual safety data sheets from 2008 to 2012 were not available to review.

deposition that Flavor Development did not warn them of any dangers from diacetyl until 2017, two years after Moncel left their employment. There was documentation admitted at trial that the supplier of raw diacetyl to Flavor Development made it promise in writing on twelve occasions to warn its customers about the danger of diacetyl. The president of Flavor Development testified in his deposition, the video of which was admitted at trial, that his company only provided warnings for substantiated dangers, but if there was a low percentage, there was no hazard to relay to its customers. Based upon our examination of the record, we conclude there was sufficient, credible evidence upon which the jury could find that Flavor Development failed to warn Midwest Roasters and Moncel about diacetyl. Accordingly, because we do not disturb the jury's answers under either theory, Flavor Development is not entitled to a new trial.

### III.    *Closing argument*

¶43    Flavor Development's final argument is that it is entitled to a new trial because Moncel's counsel's closing argument violated the circuit court's ruling on the motion *in limine* to bar "plaintiffs' counsel's reference and/or argument to the flavoring industry, as well as any reference to the wealth of Flavor Development." We turn to the record, where Moncel's counsel's closing argument included the following:

> [Juries] have power to change how industries view what they're doing. You have the power today, and it matters because this trial is public. This record is public.
>
> People have been in and out of this courtroom all week watching this trial, watching you, and they want to know can this company get away with this? Is this okay? They want to know.
>
> ....

So the question everyone has in this room is has the industry and the defendant, can they get away with it? Can they bring experts in here that have never diagnosed a single person with this disease and get paid to sit in that chair? Not us. Not enough. Not us.

¶44     The record reflects that Flavor Development did not object during Moncel's closing argument or at any time during the trial. In response to Flavor Development's motion after verdict to change the verdict or reduce the damages award because of the "inflammatory" remarks of Moncel's counsel, the trial court held that Flavor Development forfeited this claim because it did not make an objection during the closing argument. In addition, the trial court rejected this claim on the merits, holding that it "did not find that the closing arguments and statements by [p]laintiff's counsel was inflammatory in nature such that it would cause this [c]ourt to overturn the verdict of reduce the monetary award." The trial court relied **Staskal v. Symons Corp.**, 2005 WI App 216, ¶79, 287 Wis. 2d 511, 706 N.W.2d 311, which stated that this court must be "mindful that we do not disturb the award unless the verdict is so clearly excessive as to indicate passion and prejudice."

¶45     The trial court may order a "new trial based on improper statements of counsel" if the remarks prejudiced the complaining party. **Seifert**, 372 Wis. 2d 525, ¶139. We review a trial court's decision to deny a motion for a new trial under the erroneous exercise of discretion standard. *See **id.*** Here, the trial court concluded that the remarks were not inflammatory or prejudicial to Flavor Development. We conclude that the trial court's decision to deny the new trial was well within its discretion.

¶46     However, we also agree with the trial court that Flavor Development did not preserve its objection to Moncel's closing argument. Our supreme court

22

has stated that in order to bring "a question on appeal as a matter of right, it must be properly preserved. Improper remarks in closing arguments cannot be a basis for a motion for a new trial or a basis for an appeal to this court if no timely objection to the argument was made." *Hubbard v. Mathis*, 53 Wis. 2d 306, 307, 193 N.W.2d 15 (1972). Here, Flavor Development did not preserve the argument and we decline to address the merits of its argument.

## CONCLUSION

¶47 For the reasons stated above, we conclude that the trial court properly exercised its discretion to admit the testimony of Moncel's three medical experts, applying the proper standard of law. We conclude that Flavor Development's claims that the evidence was insufficient to establish causation or liability fail. Finally, we reject Flavor Development's argument that Moncel's closing argument was improper because Flavor Development failed to preserve its objection.

*By the Court.*—Judgment affirmed.

Not recommended for publication in the official reports.